### KENNEDY et al. v. COMBINED METALS REDUCTION CO.

No. 5563. Decided December 5, 1935. (51 P. [2d] 1064.)

Petition for Rehearing Denied March 27, 1936.

*Herbert Van Dam, Jr.,* and *Randolph S. Collins,* both of Salt Lake City, for appellant.

*Charles D. Moore,* of Salt Lake City, and *Mr. Leslie Frazer,* of Washington, D. C., for respondents.

EPHRAIM HANSON, Justice.

By their amended complaint the plaintiffs alleged, in substance, as follows: That the defendant is a corporation engaged in mining precious metals in Tooele county, Utah; that on or about July 10, 1929, defendant represented to plaintiff Kennedy and a Mr. Taylor that it was the owner

of the mining claims known as the Frankie Ella and Little Alex in Tooele county and defendant was desirous of having these claims developed and mined on a royalty basis; that at said time an agreement was entered into between the defendant and said Kennedy and Taylor whereby the latter should have the right to proceed at once to develop said claims, block out ore, if any were found, and produce and market the same, the defendant to receive a royalty for its share of said ore of 25 per cent of the proceeds from the first two shipments and 35 per cent from subsequent shipments; Kennedy and Taylor to receive the balance of the proceeds; that Kennedy and Taylor proceeded to explore for ore and develop said property; that in February, 1930, Taylor withdrew from the arrangement, and plaintiff Lystrup was substituted in his place and took over his rights under said agreement; that at the time Lystrup was substituted for Taylor, defendant again stated it owned said claims and that it believed they contained valuable deposits of ore and that it desired plaintiffs to proceed to explore and develop said claims; that while plaintiffs were thus engaged under said agreement, some time in May, 1931, they were notified by the Gisborn Murbrook Mining Company that it owned the Frankie Ella claim and that plaintiffs must cease further work thereon; that plaintiffs immediately notified defendant and were told that defendant owned the claim and that plaintiffs should return to their work thereon; that plaintiffs returned and worked till some time in June, 1931, when defendant discovered it did not own said Frankie Ella claim and notified plaintiffs to cease further operations on said claims under said agreement; that plaintiffs complied with such warnings and instructions and immediately ceased further operations; that plaintiffs relied upon defendant's representations and devoted substantially all of their time between July, 1929, and June, 1931, and expended a large sum of money in development operations and had driven a tunnel 225 feet and a shaft 30 feet in depth and had discovered and developed a large block of valuable mineral

bearing ore; that in performing said work and in making said expenditures on account of said contract, the plaintiffs, as a result of defendant's said breach, sustained damage in the sum of $7,725.85, for which sum plaintiffs prayed judgment.

Defendant filed a general and special demurrer to the complaint and a motion to strike certain portions. The demurrer was overruled and the motion denied. A bill of particulars was filed showing the various items of work, labor, and materials going to make up the sum sued for. Defendant answered the complaint by filing a general denial. The case was tried before a jury and resulted in a verdict in favor of the plaintiffs.

Plaintiffs' evidence showed that some time prior to July, 1929, Kennedy and another miner had obtained a six months' lease on the Honerine mining claim from defendant and were shipping ore therefrom. This was known as lease No. 164. In July, 1929, Kennedy and Taylor applied to defendant's superintendent Campbell for a lease on the Frankie Ella and Little Alex claims. The claims were pointed out to Campbell on a map in the office of defendant's engineer. Campbell stated the defendant owned them and that Kennedy and Taylor could have a lease. When asked if he was going to write up a lease at that time, he stated that they would not bother writing a lease at that time; that Kennedy and Taylor should go ahead and work month after month and when they struck ore they would write up a six months' lease. The supplies would be charged to the Honerine lease No. 164, and the defendant paid therefor from shipments made under that lease. When asked about the royalties, Campbell stated that they would be 25 per cent on the first two shipments and 35 per cent thereafter. Upon the foregoing oral understanding, Kennedy and Taylor went to work on the Frankie Ella claim the next day and continued to work thereon until in January, 1930, when Taylor withdrew and plaintiff Lystrup took his place. At the time Lystrup was substituted for Taylor Campbell was told of

the change and assented to it. Lystrup asked Campbell if the company was sure it owned the property, as he had heard the Gisborn Murbrook Mining Company was disputing the title. Campbell replied that the defendant had had it surveyed, and it was defendant's property. The question as to defendant's title to the Frankie Ella claim first arose in July, 1929, when the Gisborn Murbrook Company made inquiries as to the location of claim stakes. Defendant's engineer Craig surveyed the claim and stated it belonged to defendant, and Campbell directed Kennedy and Taylor to go back to work. Taylor and Kennedy sunk a shaft about 30 feet and had discovered an ore formation which appeared to contain sufficient values to make it shipping ore. They then decided to drive a tunnel lower down the mountain to get under this ore formation. They tunneled about 65 feet when Taylor quit. Thereafter the plaintiffs continued work in the tunnel and were in 225 feet from the portal when it was discovered defendant did not own the claim and they were told to cease operations. Defendant's engineer had surveyed the line of the tunnel for plaintiffs and they were within 65 feet of their objective when work was stopped. The formation was very hard, plaintiffs being able to go not more than a foot and a half a day. Plaintiffs' evidence further showed the amount of money expended in labor and materials.

Campbell testified that Kennedy and Taylor came to his office and applied for a lease. Campbell told them the engineer did not think much of the geological conditions, and so the defendant did not feel justified in furnishing supplies and paying liability insurance. Kennedy then said: "Lease 164 is producing. Can't we charge supplies and liability insurance to that and take it out of the shipments of that lease?" To which Campbell replied: "You mean to carry it on as part of Lease 164?" Kennedy answered: "Yes, that would be satisfactory." Campbell then said he had no objections to such arrangement. However, the cross-examination of Campbell showed that supplies were charged to

lease No. 164 only until the ore there gave out and that lease was abandoned. Thereafter the Frankie Ella project was given its own lease number, being No. 261. The supplies from then on were charged to company development work, under that lease number, and the defendant paid the same.

As a part of the cross-examination of the plaintiff Kennedy, defendant sought to introduce in evidence the written lease No. 164. The court at first refused to admit it in evidence. However, it was again offered in evidence after Campbell had testified as above indicated. It was then received in evidence and read to the jury. After the cross-examination of Campbell had disclosed that supplies were charged to lease No. 164 only part of the time and thereafter a lease number was given to the project here involved and the expenses thereafter accruing had been paid by defendant as development work, the trial court sustained plaintiffs' motion to strike lease No. 164 as evidence, and instructed the jury that said lease should not be considered by them in their decision of the case.

Defendant has assigned as error, first, the refusal to admit lease No. 164, and, second, the striking of the same from the evidence after it was admitted. It is clear that at the time defendant first offered this lease in evidence there was no evidence whatever to show that the project in question was in any manner connected with said lease, except that the defendant was to charge supplies furnished by it to said lease so as to be sure of obtaining reimbursement therefor. It is defendant's contention that Campbell's direct testimony indicated that his version of the agreement was that the Frankie Ella project would be carried on as a part of lease No. 164. He testified on cross-examination that the supplies were charged to lease No. 164 only as long as said lease was in force and ore was shipped thereunder. Thereafter the supplies were paid for by defendant and were charged to the company development work under a lease No. 261. It is clear from a reading of his testimony as a whole and from the evidence as to

what was actually done that it was never intended that the Frankie Ella project should be a part of lease No. 164 in the sense that it was subject to the terms and conditions continued in said lease. It was separate project entirely, and it continued on for some time after lease No. 164 had been terminated. The court, therefore, committed no error in withdrawing lease No. 164 from the consideration of the jury.

The defendant's remaining assignments of error, argued in its brief, all revolve about the proper construction to be given to the arrangement shown by the evidence to have been made between the parties. We shall proceed, therefore, to express our views in relation thereto without addressing ourselves specifically to any particular assignment.

It is clear that the oral arrangement did not create the relation of landlord and tenant, either under a tenancy at will or for a stated period. Nor did it create a partnership relation between plaintiffs and defendant. The evidence shows without contradiction that the parties purposely refrained from entering into a tenancy status. Plaintiffs were to prospect for ore. No one knew what would or could be discovered. There would be no earnings during this exploring work. There would only be expenses, and these were secured by charging them to another lease. It was agreed that a six months' lease was to be drawn up when ore was discovered. Until discovery of ore, no lease would be drawn. In other words, plaintiffs were to carry on exploration work to determine whether the ground contained shipping ore. If it did, then a written lease would be drawn up and plaintiffs given a definite interest in the claims. If it did not, then nothing more would be done.

It is often difficult to say that a particular arrangement creates a certain relationship so as to label it with some legal term which, in the progress of our jurisprudence, has come to have very definite limitations. We attempt to simplify by trying to apply such ready-made yardsticks to the

problem at hand. This frequently results in confusion and the creation of numerous exceptions rather than simplification. But so far as we are able to fasten a particular legal label upon the transaction between the parties here before us, it appears that the defendant simply granted plaintiffs a license or permission to go upon the claims and prospect for ore, with the understanding that should ore be discovered, plaintiffs could have a lease for six months and would be entitled to a definite percentage of the ore that would then be shipped from the claims.

As soon as it is urged that the arrangement was a "license," the granting of a right to enter and perform certain acts upon the claims, then defendant argues that, being a license, it is revocable at will. Plaintiffs answer that, while generally a license is revocable at will, in certain instances when it has been acted upon and large expenditures made in reliance upon the continuation of the license it may not be revoked, or, if revoked, the licensor must respond in damages.

It is impossible to reconcile the numerous decisions involving the revocability of what has been termed a license after the licensee has incurred expense in money or labor on the faith of a continuation of the license. As stated in a note on this subject in 7 Ann. Cas. 706, the whole matter "is involved in obscurity." In the note numerous cases are cited and commented upon, and the hopeless conflict of the decisions is made apparent. The leading case, apparently, in support of the doctrine that the license, under the conditions above specified, cannot be revoked is *Rerick* v. *Kern,* 14 *Serg. & R.* (Pa.) 267, 370, 16 Am. Dec. 497, wherein the court said:

"But a license may become an agreement on valuable consideration; as, where the enjoyment of it must necessarily be preceded by the expenditure of money; and when the grantee has made improvements or invested capital in consequence of it, he has become a purchaser for a valuable consideration. Such a grant is a direct encouragement to expend money, and it would be against all conscience, to annul it,

as soon as the benefit expected from the expenditure is beginning to be perceived."

The above quotation was approved by this court in the case of *Maple Orchard Grove & Vineyard Co.* v. *Marshall,* 27 Utah 215, 75 P. 369, 370, and it was there held that a license to enter another's land and construct a pipe line to carry water for irrigation was irrevocable after entry and construction of the pipe line at considerable expense. The court did not refer to an earlier decision in the case of *Yeager* v. *Woodruff,* 17 Utah 361, 53 P. 1045, which held that the license, as there involved, to maintain a ditch was revocable at will. The latter case may be distinguished, however, as it appears that the right to the use of the ditch was understood to be only temporary and would continue only so long as it did not interfere with the licensor's use of his land.

This court in the *Maple Orchard Grove* Case, supra, uses the following language:

"It is true, a mere parol license to enter upon the land of another for a specific purpose, or to construct a specified thing thereon, even if it contemplates the expenditure of money, may, so long as the license remains unexecuted, be revoked by the licensor, or owner of the land, as within the statute of frauds; but where, as in this instance, the license has induced the expenditure upon the land of considerable sums of money by the licensee, and has been fully executed in good faith, and the pipe line, or object of the license, used for a long period of time by the licensee without objection by the licensor, the law—at least, as declared by the great weight of authority—is otherwise. In such case the license to construct a particular thing on the licensor's land, and to enjoy the same without limit as to time, followed by the expenditure of money on the faith of it, will, when, as here, fully executed, be regarded and treated in equity as a binding contract, and is then irrevocable—this upon the principle of estoppel. * * * To permit a revocation under such circumstances would be a fraud upon the licensee, because the parties could not be placed in statu quo after the license has become executed."

It would seem, therefore, that this court is committed to the doctrine that a license may become irrevocable upon the expenditure of money in reliance upon a continuation there-

of upon the theory that to allow a revocation would be a fraud upon the license.

The case of *Dark* v. *Johnston*, 55 Pa. 164, 93 Am. Dec. 732, is in many respects similar to the case at bar, except that in that case the license was in writing. The licensee was permitted to prospect for oil, and in the event oil was found he was to have a conveyance of certain land and a lease of other lands. The court construed the agreement as being in two parts; one a mere license to search for oil, and the other for the conveyance and lease, and decided that the two were not to be confounded. In construing the license and passing upon its revocability, the court cites *Le Fevre* v. *Le Fevre*, 4 Serg. & R. (Pa.) 241, 8 Am. Dec. 696, and *Rerick* v. *Kern*, supra, and says:

These are cases, it is true, where the license was not personal, but where a servitude has been imposed for the benefit of another tenement. In them an easement was allowed in favor of the dominant tenement, appurtenant to it, and passing with it to a grantee of the license, as held in *McKellip* v. *McIlhenny*, 4 Watts [Pa.] 317 [28 Am. Dec. 711]. The same reasons which were controlling in these decisions appear to us to be applicable to the present case. Admitting, as we must, that we are not to confound the contingent covenant to sell the island, and to accept Baird as a tenant of wells on the main land, with the antecedent rights given to explore, we have still the facts that under the license to explore he was in possession of certain portions of the land, that such possession was authorized, that in taking it and continuing it large expenditures had been made, and that neither the occupancy itself nor the right to maintain it has ever been abandoned. Add to this the fact that if oil should be discovered as a result of his search, Baird was assured that he would be entitled to a conveyance of the island and a lease of wells on the main land, and it would seem grossly unjust in McGuire to make all his expenditures fruitless to him, and by revoking the license deprive him of the right, the expectation of which induced his expenditure. * * * Call this what we may, an easement, which is an incorporeal right, or a temporary right to possession, defeasible, and ended when it shall be ascertained that the land does not contain oil, it was not for Mr. McGuire to take it away."

In *Beatty* v. *Gregory*, 17 Iowa 109, 85 Am. Dec. 546, the court says:

"Mr. Bonson, as the owner of a large quantity of mineral lands, is applied to for the right to mine upon them. He replies: 'I will give you the right you desire, you paying me as rent, one-sixth of all mineral discovered.' Nothing is said as to the duration of the right, or the mode of termination. The miner, upon the faith of this permission takes possession, expends his labor and money, in sinking shafts, running drifts, purchasing tools, providing machinery, etc. Laying out of view any rights derivable from custom, and applying to the case (in the absence of special contract regulating the rights and duties of the respective parties) the ordinary rules of the law, can the owner instantaneously and absolutely revoke the license, so as, from that moment forward, treat the miner as a trespasser or intruder? Most clearly not. It would be a shame and reproach to the law, if this could be done. The general principles of the law are against it."

In *Hosford* v. *Metcalf*, 113 Iowa 240, 243, 84 N. W. 1054, the court relied upon *Beatty* v. *Gregory*, supra, and held that where a license to explore for minerals has been acted upon and money and labor have been expended in reliance thereon, it cannot be revoked by the licensor without compensating the licensee.

In Mills-Willingham, Law of Oil and Gas, page 13, the doctrine announced by the foregoing cases is summarized as follows:

"In Pennsylvania and in a number of the other states a license is revocable only so long as it remains executory. It cannot be revoked after the license in reliance thereon has erected permanent structures or made lasting improvements. The Pennsylvania rule is in accordance with the idea of satisfaction of the Statute of Frauds by part performance. An oral contract for the sale of land is good where the money has been paid and the purchaser put in possession. By analogy an oral grant of an incorporeal hereditament will be good where the grantee has entered upon the premises with the grantor's consent and made permanent improvements. This is not to say that a license is an incorporeal hereditament; it means that the grant was a license as long as it remained executory because it was not in proper form for a conveyance of an incorporeal hereditament. It ripened into an incorporeal hereditament when the licensee entered into enjoyment thereof and made expenditures and improvements. Other jurisdictions hold that revocation will not be allowed in such a case unless the licensee be compensated for his improvements."

While the license, in the case at bar, did not specify the time it should continue, it must be held that the licensees' rights would continue for so long a time as the nature of the license would call for. *Stoner* v. *Zucker,* 148 Cal. 516, 83 P. 808, 113 Am. St. Rep. 301, 7 Ann. Cas. 704. Plaintiffs were to prospect for ore. Presumably a time would come, when, if the exploration work were carried on with reasonable diligence, it would be determined that there was or was not ore in the claims. So long as plaintiffs were pursuing their work with reasonable diligence, the license would continue. In any event, defendant did not claim plaintiffs were violating their license in any manner. On the contrary, defendant was assisting them in prosecuting the work and had no intentions of revoking the license until it was fully determined it did not own the claim.

In harmony with the principles announced by the authorities herein referred to and quoted from, we are of the opinion that there was such expenditure of money and labor by plaintiffs in reliance upon the continuation of the license to explore for ore that such license became so far a completed contract that the same could not be revoked by defendant without its being liable in damages. To hold otherwise would be manifestly unfair to plaintiffs and a fraud upon them. The mere fact that defendant did not own the claim and for that reason revoked the license could not alter its legal responsibility to plaintiffs. In any case, the reason for wanting to revoke the license, so far as the licensor is concerned, might be a perfectly good one, but the unfair effects upon the licensee remain the same whether the reason is good or bad. It is immaterial on what ground the license was revoked so long as the license was, in law, irrevocable. If the license is revocable, no reason for revoking it need be given. If not revocable, then there is no ground upon which its revocation can be sanctioned.

It would serve no useful purpose to attempt to harmonize or distinguish the cases cited by the parties in their briefs. As already indicated, there appears to be considerable con-

fusion on this subject. We are satisfied with the views announced by those authorities which we have cited.

We are of the opinion, therefore, that plaintiffs' complaint stated a cause of action, and that the evidence was sufficient to take the case to the jury and is ∎ sufficient to sustain the verdict. The judgment of the lower court is affirmed, with costs to respondents.

ELIAS HANSEN, C. J., FOLLAND, J., and CHRISTENSEN, District Judge, concur.

WOLFE, Justice (concurring).

I think it well that we do not attempt in such a case as this to fasten on any particular theory to support the result. It is quite obvious that where one is permitted or encouraged to go in and develop another's property, expending time and money thereon for the common benefit of the owner and the permittee, it would be an injustice to allow the owner to terminate such arrangement without remuneration. The theory supporting the result is not important. Sometimes attempts to "scientificize" results are trammeling rather than elucidative. Whether we consider it as a license, unrevocable, without reimbursement for the actual expenditure of a material amount of labor or money, or as an arrangement in the nature of a cropper's agreement (if reciprocal obligations can be inferred), or some other arrangement designated in law by some other name, would make no difference in the result. The ultimate thing is to lay down a rule which will do justice. And if the plaintiffs, without inexcusable negligence in failing to check up ownership, were misled by the misrepresentations of the defendant as to ownership, the latter must bear the consequences of such mistake. In this case, I do not think the plaintiffs were negligent in the sense that their negligence contributed to or caused the mutual mistake. Therefore I concur.

MOFFAT, J., being disqualified, did not participate herein.