G. R. KELLY, *et al.*

*v.*

RAINELLE COAL COMPANY, A CORPORATION

(No. 10309)

Submitted January 11, 1951.   Decided March 13, 1951.

GIVEN, JUDGE, dissenting.

*Peter Barrow, Jr., John L. Detch, Mahan, White & Higgins,* for plaintiff in error.

*Sheldon E. Haynes, John A. Lile,* for defendants in error.

LOVINS, JUDGE:

G. R. Kelly and W. L. Kelly brought this action against Rainelle Coal Company, a corporation, in the Circuit Court of Greenbrier County, to recover damages for the alleged wilful mining and removal of coal belonging to the plaintiffs.

A jury trial resulted in a verdict for plaintiffs in the sum of $15,541.00. The trial court, after overruling motions to set aside the verdict and in arrest of judgment, rendered judgment for the amount of the verdict with interest thereon from the date of its rendition. The defendant brings the case to this Court by writ of error. Plaintiffs and defendant will be hereinafter so designated.

Prior to the 6th day of February, 1940, Leckie Smokeless Coal Company, a corporation, hereinafter referred to as "Leckie", was the owner of all the coal, or at least the Sewell vein of coal, underlying a tract of land consisting of 264 acres situate in Meadow Bluff District, Greenbrier County, West Virginia. H. N. Shawver seems to have owned the surface of such land at that time. The record is not clear whether Nettie Shawver, the wife of H. N. Shawver, owned any interest in the land in her own right.

Leckie entered into a contract with H. N. Shawver and Nettie Shawver, reading in part as follows:

> "This Contract, made and entered into this the 6th day of February, 1940, between H. N. Shawver and Nettie Shawver, his wife, parties of the first part and Leckie Smokeless Coal Company, a corporation, party of the second part.

> "Witnesseth, that Whereas, the party of the first part is the owner of a certain tract of land containing 264 acres, more or less situated on Rich Knob and the waters of Mill Creek in Meadow Bluff District, Greenbrier County, West Virginia, which tract is more fully described in Deed Book 40, page 539 in the office of the Clerk of the

County Court of Greenbrier County, West Virginia and,

"Whereas, the party of the second part is the owner of the coal and other minerals and mining rights under said tract but said mining rights being subject to the provision in the deed of conveyance that 'any loss or damage to buildings, growing crops or cleared land caused by such mining operations shall be paid to the owner of the fee simple' and;

"Whereas, the party of the second part desires to be released from any damage claims which may be set up by the party of the first part either for damage sustained by mining done in the past or that may be done in the future, the party of the first part hereby agrees, for the sum of five hundred dollars ($500) receipt of which is hereby acknowledged, to release the said Leckie Smokeless Coal Company, party of the second part, from the payment of any damage claims of any kind for damage to the surface, growing crops, buildings or damage claimed due to the loss of springs, wells, or any source of water supply or any other damage that might be claimed as caused by the mining operations of the party of the second part under the above described tract of land and the party of the second part, its heirs or assigns, may complete the mining of any remaining coal under said tract without regard to the breaking of the surface or to the damage of anything thereon and,

"Whereas, the party of the first part desires the privilege of mining any outcrop coal or any other coal that may be left in the Sewell Seam under the above described tract after the party of the second part has completed the mining of any coal which it desires to mine, the party of the first part is hereby granted and leased, for the price and on the terms hereinafter set out, the privilege of mining and marketing any such remaining coal under said tract and in the Sewell Seam only, the term 'Sewell Seam' meaning the seam being now operated on said tract by the party of the second part. The party of the first part agrees to pay as royalty the sum of ten cents for each ton of two thousand pounds mined under this agreement and further that he will not mine

any coal except in the locations selected by the party of the second part and that no mining will be done except as approved by the mining engineer of the party of the second part, it being understood that this provision is for the purpose of protecting the mines of the party of the second part against any possible damage by water, squeezes or damage to their ventilating system.

"It is further agreed that the party of the second part has no interest or obligation in connection with the proposed mining of the party of the first part except as herein stated and the party of the first part assumes full responsibility for all damages that may be done to the property or to the public in the conduct of his mining. ' The party of the second part is hereby given full authority to stop any work of the party of the first part that may endanger any of its mine workings. * * *"

The last paragraph of the contract provides that the Shawvers should install a scale or construct a tipple so that the coal mined by them could be weighed or measured, and provides for reports to Leckie's engineer and monthly payments of the royalty. The contract was signed by H. N. Shawver, Nettie Shawver and Leckie Smokeless Coal Company, by W. S. Leckie, President. It was not attested by the secretary of Leckie. The contract was acknowledged by the Shawvers but not acknowledged on behalf of Leckie.

Nettie Shawver, acting for herself and as administratrix of the estate of H. N. Shawver, he having died in the interim, by contract dated the 3rd day of August, 1944, attempted to transfer the benefits under the contract between her husband and Leckie to the plaintiffs. The contract between Nettie Shawver and the plaintiffs did not transfer any greater rights to plaintiffs than she and her husband acquired by the agreement herein above quoted.

Plaintiffs entered on the property and did some mining and removed some coal but did not operate it regularly.

Defendant procured an agreement from Leckie under

date of the 21st day of May, 1947 wherein the defendant was granted the right to remove coal "from a part of the property that the party of the second part (Leckie) has a right to remove coal by 'strip mining' methods". The contract between defendant and Leckie provides that Leckie "does hereby let and lease to the party of the first part (defendant), for a period of 10 years, from and after date hereof, the sole and exclusive right and privilege of strip-mining and removing coal from the *seawall* seam of coal." The defendant agreed to pay Leckie the sum of thirty cents per net ton of two thousand pounds royalty. Various other provisions of the contract between defendant and Leckie are not material to the questions presented in this action.

The president of the defendant, having acquired knowledge that plaintiffs had some interest in the coal, started negotiations with a view to purchasing plaintiffs' right to the coal but the negotiations were unsuccessful. After the negotiations between the president of the defendant and the plaintiffs, Leckie prepared and delivered to one of the plaintiffs a written notice which set forth that the "license to mine coal, heretofore granted to Nettie Shawver, jointly with her husband, in the Sewell seam a certain tract of land containing 264 acres, more or less" was terminated and cancelled, and set forth that Leckie did not recognize the right of Nettie Shawver to assign the "license" to the plaintiffs. The revocation by Leckie bears date the 13th day of October, 1947.

In December, 1947, the defendant entered upon the 264 acre tract of land and during the months of December 1947, January and February 1948, mined and removed therefrom 15,416.45 tons of coal, the mining being done by strip-mining methods. The declaration originally filed herein alleged that the value of the coal removed by the defendants from the land was $25,000. A demurrer to the original declaration was sustained on the ground, among others, that Mrs. Shawver had no right to assign the interest and rights, if any, belonging to the estate of her husband. It was developed in the course of the

trial that John Coalter was the owner of a one-half interest in the coal mined and sold. Coalter received one-half of the royalty paid by defendant and he paid five cents per ton of the royalty so received by him to Nettie Shawver.

The record shows that the plaintiffs attempted to negotiate with a representative of Leckie with reference to their interest in the coal and that such negotiations were abandoned. Plaintiffs' evidence shows that Leckie's chief engineer delivered a map to them and marked on such map with red pencil the area where plaintiffs could mine. The engineer who was alleged to have so marked out the area for mining by plaintiffs disclaimed any knowledge of such act.

There is evidence tending to show that a portion of the mine of Leckie had been abandoned by it. There is also evidence tending to show that such abandonment had not taken place, and that the vicinity where the strip mining took place had been utilized by Leckie as an entrance or passage way, and in some instances, some coal had been mined and removed by Leckie in that vicinity. In February, 1948, the defendant ceased mining. This action followed.

In an amended declaration plaintiffs alleged a right in an undivided one-half interest in the coal and the right to mine and remove same. The demurrer to the amended declaration was overruled.

After the verdict had been read and before the trial court ruled on the motion to set aside the verdict, one of counsel for the defendant inspected the room wherein the jury had deliberated on its verdict. In support of the motion to set aside the verdict defendants show that the room where the jurors' deliberations took place had been thoroughly cleaned prior to the jury in the instant case using such room; that all papers had been removed therefrom; that no case involving monetary damages had been tried between the times when the room was cleaned and

the time when the jury deliberated on its verdict; and that after the jury's deliberation had ended fourteen pieces of paper were found. Twelve small pieces were in a cuspidor. On eleven of the pieces of paper figures of varying amounts were written. On one of the pieces of paper the amount thereon had been obliterated. Two larger pieces of paper, having been a single leaf which had been torn, were likewise found in the room. When the two pieces of torn paper were fitted together it was found that eleven of the amounts appearing on the small pieces of paper, as well as another amount presumably the one which had been obliterated, had been written on a single sheet, that the twelve amounts so written on the two larger pieces of paper had been added together, and that the amounts when added together equaled $186,500. The sum of such addition had been divided by twelve, resulting in $15,541.00, the exact amount of the verdict in dollars. Defendant from those facts infers and now contends that the verdict returned by the jury was a quotient verdict.

Defendant contends that the court erred (1) in overruling the demurrer to the amended declaration; (2) in admitting over objection of defendant certain evidence offered by plaintiffs and in rejecting admissable evidence offered by defendant; (3) in refusing to give instruction No. 4 tendered by defendants; (4) in overruling the motion to set aside the verdict.

The grounds urged to sustain the demurrer to the amended declaration are: (a) that there was no allegation therein that Leckie had completed its mining in the area where plaintiffs allegedly had a right to mine, (b) that the contract between the Shawvers and Leckie was not a recordable instrument, not being acknowledged by Leckie, and (c) that the contract between Leckie and the Shawvers granted a bare license and was therefore not assignable or inheritable.

The failure of plaintiffs to allege that Leckie had completed the mining of such coal as it desired to mine is not

a ground for demurrer. That condition pertains more to the evidence adduced on the trial. Since the contract between the Shawvers and Leckie is copied at length in the amended declaration, it is at least necessarily implied in the declaration that the mining by Leckie had been completed. It is implicit in the amended declaration that the mining by Leckie had been completed in the areas where the defendant strip mined.

It is true as herein above stated that Leckie's officers did not acknowledge the contract between it and the Shawvers, and the fact that such agreement was spread on the records of Greenbrier County would not amount to an admission of such instrument to record as to Leckie. In a similar situation this Court said "acknowledgment by the creditor only would not authorize recordation as to the grantor." *Ihrig* v. *Ihrig,* 78 W. Va. 360, 88 S. E. 1010. Applying that principle to the contract here, we hold that the contract between the Shawvers and Leckie was not admitted to record as to Leckie. But for the purposes of this action admission of that contract to record is immaterial. The defendant's president had actual knowledge of the contract and therefore the question of recordation is of no moment.

In brief and argument no part of the evidence admitted or rejected is pointed out. An examination of the record does not disclose any prejudicial error in admitting or rejecting evidence.

Instruction No. 4 tendered by defendant and refused is a binding instruction and restricts the theory of the plaintiffs with respect to their recovery in that it establishes as controlling, the abandonment of the tract of coal by Leckie as of the date the defendant ceased its operations. We think that if Leckie had abandoned the coal at any time after its contract with Shawver such action would have been sufficient to satisfy the terms of the contract in that particular. Furthermore, instruction No. 5 given at the request of defendant is sufficient to present the theory embodied in plaintiffs' instruction No.

4. It is not desirable nor necessary to duplicate instructions. *Robertson* v. *Hobson,* 114 W. Va. 236, 171 S. E. 745; *State* v. *Thomas,* 110 W. Va. 192, 157 S. E. 162; *State* v. *Bowles,* 109 W. Va. 174, 153 S. E. 308; *State* v. *Peoples,* 106 W. Va. 262, 145 S. E. 389.

Defendant urges as a reason for sustaining the demurrer to the amended declaration that John Coalter, the owner of one-half interest in the coal, was not made a party to the action. This action sounds in damages, and if the defendant wrongfully and unlawfully mined and removed coal which the plaintiffs owned, it was a wrong for which the plaintiffs could obtain satisfaction to the extent suffered by them. We do not think there was any error in the failure to join Coalter in this action since it is clear that the plaintiffs could recover only for the damages done to their estate, if any they owned, in the coal.

The verdict does not exceed the amount of damages claimed in the amended declaration. It is true that plaintiffs allege the value of the coal was $25,000 and they allege that they own only one-half of it, but this action is grounded on a claim for damages in an amount to be determined by a jury, and if the defendant unlawfully mined the coal belonging to the plaintiffs the plaintiffs may have sustained damages in addition to the value of the coal.

The reasons given by the defendant in support of its motion to set aside the verdict are (a) that the verdict was a quotient verdict; (b) that the agreement between Leckie and the Shawvers granted a mere license; (c) that the conditions surrounding the granting of the license by Leckie to the Shawvers provided that Leckie retain the dominant estate in and to the coal referred to therein, and hence the Shawvers and plaintiffs, as assignees of the Shawvers' rights, took no estate or interest in the coal by virtue of such contract and assignment thereof.

It is a rule of general application that quotient verdicts are illegal. "The quotient verdict implies an agreement

in advance among the jurors that each shall put down the amount which he thinks the verdict should be, and the aggregate of said sums is then divided by twelve." *Miller* v. *Transportation Co.*, 123 W. Va. 428, 437, 15 S. E. 2d 400. A verdict rendered by a jury in a civil action in accordance with a prior agreement by the jurors "to accept one twelfth of the aggregeate amount of their several estimates of the measure of damages, without the assent of their judgment to such a sum as their verdict, is invalid * * *." 53 Am. Jur., Trial, Sec. 1030. See 35 Words and Phrases 677. 4 Minor's Institutes, part 1, page 935. Anno. 52 A.L.R. 41, where other authorities are cited.

As mentioned in *Miller* v. *Transportation, supra*, it is difficult to establish an agreement between the jurors prior to the verdict that they will abide by the result of the mathematical calculation utilized in finding a quotient verdict. Evidence of the jurors themselves is not admissable to impeach the verdict.

An examination of the record herein discloses beyond peradventure that the jurors in this case reached their verdict by adopting a quotient resulting from the division of $186,500.00 by twelve. It is true that there is no direct proof that the jurors agreed to be bound by the result of such calculation prior to the finding of the verdict. But the facts are so clear and the result so plain that no inference can be drawn other than that the jurors who returned this verdict were actually bound by the result of the mathematical calculation. The quotient shown by the papers found in the jury room is the exact amount of the verdict. The return of a quotient verdict should not go unnoticed when the proof is so clear, and the inference so plain that the contrary cannot be supposed. We are therefore of the opinion that the verdict is a quotient verdict, and that it should be set aside.

This record presents a problem whether the contract between the Shawvers and Leckie created an easement, a *profit a prendre*, a license coupled with an interest, a bare license, or a lease.

An easement may be defined as the right one person has to use the lands of another for a specific purpose and is a distinct estate from the ownership of the soil itself. We do not think that the contract between Leckie and the Shawvers vested any easement in the Shawvers. The right to use the surface of the soil which seemed to have been owned by H. N. Shawver for any purpose is not mentioned in the contract between Leckie and the Shawvers. We are of opinion that no easement was contemplated, created or granted in that contract.

The implications of the contract come nearer to creating a *profit a prendre.*

A *profit a prendre,* also called "right of common" is a right exercised by one man in the land of another with the additional right to participate in the profits of the soil, take a part thereof or some of the produce of the land. See Black's Law Dictionary, 3rd edition, page 1440; 3 Bouvier's Law Dictionary, Rawle's Third Revision, page 2736. At common law the right of common was treated as an incorporeal hereditament consisting chiefly of four kinds, common of pasture, of piscary, of turbary and of estovers. I Chitty's Blackstone, Book Second, page 24; I Minor on Real Property, 2d Edition, Ribble, Section 70; 34 Words and Phrases 238. In some jurisdictions the doctrine of *profit a prendre* has been applied to the right to go upon land and take designated substances therefrom, including minerals. See *Trimble* v. *Kentucky River Coal Corporation,* (Ky.), 31 S.W. 2d 367. In the *Trimble* case, a number of cases are cited as embodying some phase of the doctrine relating to *profits a prendre.* For the principles applicable to the creation of, and right to a *profit a prendre* see *Albright* v. *Cortright,* (N.J.), 45 A. 634, 48 L.R.A. 616; *Mitchell* v. *D'Olier* (N.J.), 53 A. 467, 59 L.R.A. 949. A *profit a prendre* in gross is in the nature of an estate in land rather than an easement, and is assignable and inheritable. *Saratoga State Waters Corporation* v. *Pratt,* (N.Y.) 125 N.E. 834. For a further discussion of the doctrine see Ann. L.R.A. 1918 F 451 et seq., and Ann. Cas. 1917 D 93. See *Council* v. *Sanderlin,*

(N.C.), 111 S.E. 365, 32 A.L.R. 1527, and the annotation in the same volume at page 1533.

As pointed out in the opinion in the case of *Trimble v. Kentucky River Coal Corporation, supra,* there are two rules, corporeal and incorporeal. We have not found any references to the doctrine in reported decisions of this Court, but the treatment accorded by this Court to similar questions indicates that we have followed the corporeal rule. See *Reynolds v. Whitescarver,* 66 W. Va. 388, 66 S. E. 518, and *Light & Heat Co. v. Knapp,* 102 W. Va. 308, 135 S.E. 1. Instead of denominating an estate by way of a *profit a prendre* as such, this Court seems to have treated estates of that kind as a license coupled with an interest, which is probably a broader and more inclusive term.

An example of a license coupled with an interest will be found in the case of *Lumber Co. v. Fuel Co.,* 88 W. Va. 61, 106 S.E. 41, in which case the fuel company, holding a mining lease, asserted the right to take all the timber growing on a large tract of land, contending that it was the owner of all the timber upon the land twelve inches and over in diameter. This Court held that the fuel company, under its mining lease, was a holder of a license coupled with an interest and had the right to use so much of the timber on the tract of land as was reasonably necessary in connection with the mining operations authorized by its lease, but that the fuel company did not have the right to use the timber upon the land for general purposes, the use of the land being restricted to direct mining operations. See *Godfrey v. Coal & Coke Co.,* 82 W. Va. 665, 97 S.E. 186; *Lumber Co. v. Coal Co.,* 83 W. Va. 341, 98 S.E. 563; *Coal Co. v. Lumber Co.,* 98 W. Va. 698, 127 S.E. 644.

In the case at bar there is no interest in the coal granted to the Shawvers except the right to mine and remove the coal under the conditions prescribed by the contract. The conditions under which the license was to be exercised prevented the rights given from becoming

a *profit a prendre* or a license coupled with an interest, since Leckie could designate the places where mining was to be done or entirely prevent such operations. We can see no basis for holding that if the rights conferred by the agreement between Leckie and the Shawvers confer a license, such license is coupled with an interest. Therefore, if it is a bare license, it is revocable at the pleasure of Leckie, the licensor.

We now come to the question of whether the contract confers a bare license. It is to be noted that the agreement provides that the Shawvers were "granted and leased * * * the privilege of mining and marketing * * *" coal from the Sewell seam. As expressed by a learned judge, courts have been wrestling with the identical problem here presented for "a hundred years". The distinction between a lease and a license is: A license in the aspect here discussed grants to some person the right "to do some act or a series of acts on the land of another without passing an estate in the land". 16 R.C.L. 549. It is a personal right, is not assignable, and grants no estate in land affected by it. *Id.* In the case of *Coal & Oil Co.* v. *Harrison,* 71 W. Va. 217, 76 S.E. 346, a clause in a deed of conveyance from parents to a child as an advancement which reserved to the parents " 'the privileges of selling and removing any timber from said land that they may desire to sell or to use and also the right of way through said lands to remove the same' ", was held to create only an unassignable license, which was revoked by an attempt to assign it. See I Minor on Real Property, 1908 Ed., Sec. 133 et seq. We are mindful of the opinions of this Court with respect to conveyances of oil royalty and oil and gas interests. See *Williamson* v. *Jones,* 39 W. Va. 231, 19 S.E. 436; *Preston* v. *White,* 57 W. Va. 278, 50 S.E. 236; *Paxton* v. *Oil Co.,* 80 W. Va. 187, 94 S.E. 472. We also have noted the holdings of this Court with respect to the right to go on land and cut timber and remove it as exemplified in *Keystone Co.* v. *Brooks,* 65 W. Va. 512, 64 S.E. 614, and *Williams* v. *McCarty,* 82 W. Va. 158, 100 S.E. 565. In *Williams* v. *McCarty, supra,* the various rules

relating to cutting and removing of timber are discussed and analyzed, and the principle applied by various courts clearly stated.

Where there is no interest granted in the minerals as such and a right is merely given to go on the land and remove certain minerals, such a license was held to be revocable at the will of the licensor even though exclusive. *Barksdale and als.* v. *Hairston and others*, 81 Va. 764. An agreement similar to the one here involved was considered and applied by the court in the case of *Church* v. *Goshen Iron Co.*, (Va.), 72 S.E. 685, the court holding that a mere license was created. We do not approve the full implications of those two cases.

For the general characteristics of a mining license as distinguished from a mining lease, see 36 Am. Jur., Mines and Minerals, Sec. 40.

Did the agreement between Leckie and the Shawvers create a lease? There is nothing exclusive in the provisions of the contract, no permission was granted to erect any structures other than a tipple or scales, and no definite time is prescribed for the duration of the right such as was provided in the lease considered by this Court in the case of *Coal & Coke Co.* v. *Tax Commissioner*, 59 W. Va. 605, 53 S.E. 928, and by the Virginia Court in the case of *Young* v. *Ellis*, (Va.), 21 S.E. 480. The usual and necessary provisions of exclusiveness, definite time of existence, and the granting of a right or estate in the coal being absent in the contract, the conclusion is inevitable that the contract created no lease between Leckie and the Shawvers. Leckie maintains dominion and control over the coal which was the subject of the contract between it and the Shawvers.

Did Leckie by its contract with the Shawvers maintain such ownership and dominance in the Sewell Seam as to prevent any title to the coal vesting in the plaintiffs? It is difficult to find any place in the contract between Leckie and the Shawvers where the Shawvers were given complete and exclusive control over the coal. They

could not mine the coal any place of their own selection, and they could not mine coal when forbidden to do so by Leckie. The Shawvers could only mine in areas designated by Leckie. The entire tone of the contract, ineptly drawn as it was, indicates that Leckie, the owner of the coal, retained its rights, dominance and control over the mining of the coal. That element or factor alone in the contract destroys the basis of the claim upon which the plaintiffs must necessarily recover, namely, that they were the owners of certain coal.

The plaintiffs have not shown that they own the coal, and having shown no ownership thereof, they are not entitled to recover for the mining and removal thereof by the defendant. We therefore reverse the judgment of the Circuit Court of Greenbrier County and set aside the verdict upon the grounds (a) that the verdict was quotient, (b) that the plaintiffs had only a bare license which was revoked upon its attempted assignment by the Shawvers, and (c) that the interest and rights granted to the Shawvers were so restricted that Leckie retained dominance over the coal so that the Shawvers, and hence their assignees, the plaintiffs, took no ownership of the coal in place.

The judgment of the Circuit Court of Greenbrier County is reversed, the verdict is set aside and a new trial awarded the defendant.

> *Judgment reversed;*
> *verdict set aside;*
> *and a new trial awarded.*

GIVEN, JUDGE, dissenting:

I am of the opinion that the propositions of law set out in the syllabus are correctly stated, but of the further opinion that Points 2, 3 and 4 thereof have no application to the facts of this case. I presume that the majority will concede this if the contract between Shawvers and Leckie, dated February 6, 1940, is, in effect, something more than a "bare license". It seems clear to me that the instrument is a mining lease. It is not so important,

of course, what technical terminology we apply to the instrument, for all agree that, in this State, we determine the intent and effect of an instrument by viewing it from its "four corners", and enforce it according to the intent of the parties, unless to do so would violate some positive rule of law. *Marmet* v. *Watson*, 106 W. Va. 429, 145 S. E. 744. To assist in making my position clear, I quote that part of the instrument not set out in the majority opinion:

"The party of the first part agrees to either install a scale which will accurately weigh all coal so mined or, instead of a scale, to so construct his tipple or bins that all coal may be accurately measured and further that he will consult with the engineers of the party of the second part as to the proper construction of said arrangement for measuring the coal and that he will report, not oftener than once each month as required by the party of the second part, all coal mined under this agreement and make payment for same at the office of the party of the second part at Anjean, West Virginia.

"In Testimony Whereof witness the following signatures and seals this the day and year as first above written."

Stripped of its formal parts, the contract simply "granted and leased, for the price and on the terms hereinafter set out, the privilege of mining and marketing", all of the outcrop coal remaining in the Sewell Seam, under the Shawver tract after Leckie had completed its own deep mining operations of the coal in that seam, under that tract. In consideration of this grant and the sum of $500.00 cash, Shawvers released Leckie from all liability as to any "damage claims of any kind for damage to the surface, growing crops, buildings or damage claimed due to the loss of springs, wells, or any source of water supply or any other damage that might be claimed as caused by the mining operations" of Leckie. Also, the instrument required Shawvers to pay unto Leckie a royalty of ten cents per ton for coal mined.

True, the instrument contained an agreement on the part of Shawvers not to mine any coal except in "locations" selected by Leckie, but this agreement did not reduce the substance of the grant; it merely limited operations thereunder. Leckie could not arbitrarily, without reason therefor, refuse to make such locations when it had completed its deep mining operations under such locations, or if and when it had abandoned areas of the outcrop coal. There is no indication in any part of the instrument that the grant or lease was made upon any condition. Moreover, the agreement on the part of Shawvers not to mine except at "locations" selected by Leckie was made for, and expressly limited to, the specific "purpose of protecting the mines of the party of the second part against any possible damage by water, squeezes or damage to" the ventilating system of Leckie. No such damage could possibly have been caused Leckie by Shawvers' operations of areas completely deep mined and abandoned. It may be noted that the plain wording of the quoted provisions of the instrument discloses a clear intent that Shawvers were to be permitted to mine the outcrop coal at locations upon the tract before Leckie had completed its deep mining operations as to the entire tract. As will be shown later, this is exactly the way the parties interpreted the contract, and the way they operated thereunder for a number of years, Shawvers mining coal, and Leckie demanding and accepting royalties therefor. *Marmet* v. *Watson*, 106 W. Va. 429, 145 S. E. 744; *Coal Co.* v. *Pocahontas Corporation*, 109 W. Va. 39, 152 S. E. 785.

Authority of Leckie to terminate the lease and operations of Shawvers, as indicated by the majority, was not the right or privilege to terminate all operations of Shawvers, but only, "to stop any work of the party of the first part that may endanger any of its (Leckie's) mine workings." Nowhere in the instrument is there any provision to the effect, as would seem to be indicated by the majority opinion, that Shawvers "could not mine coal when forbidden to do so by Leckie" after locations for operations by Shawvers had been made and agreed

to by Leckie. If any doubt exists as to whether Shawvers had any interest in the outcrop coal before Leckie had made any such location, that doubt would certainly, in my opinion, be dissolved after a location had been made and agreed upon by Leckie. See *Williams* v. *McCarty*, 82 W. Va. 158, 95 S. E. 638, 100 S. E. 565, 15 A. L. R. 9; *Hosford* v. *Metcalf*, 113 Iowa 240, 84 N. W. 1054.

In view of the plain provisions of the instrument, even had there been no practical construction thereof by the parties and no partial performance in accordance with such construction, I am unable to conceive how the majority arrives at the view that "The usual and necessary provisions of exclusiveness, definite time of existence, and the granting of a right or estate in the coal being absent in the contract, the conclusion is inevitable that the contract created no lease between Leckie and the Shawvers." The grant was the privilege to mine all the outcrop coal not mined by Leckie, not merely part of it, on the Shawver tract of 264 acres, fully described. How could the right to mine all the outcrop coal be more exact or exclusive? Certainly if Shawvers were to mine all, then no other person could mine part. This implies, at the least, reasonable time to mine all such coal after locations had been made by Leckie. Otherwise title to the coal vested in Shawvers. If title to the coal actually vested in Shawvers, as appears to be held by our cases, no time limit was necessary. *Keystone Company* v. *Brooks*, 65 W. Va. 512, 64 S. E. 614; *Williams* v. *McCarty*, 82 W. Va. 158, 95 S. E. 638, 100 S. E. 565, 15 A. L. R. 9. In the *Keystone* case this Court held: "In case of a deed conveying legal title to timber, though the deed contemplates removal of timber, there being no limit of time for removal and no clause of forfeiture for failure to remove, title to the timber is not lost to the purchaser for such failure." In the opinion it is made clear that the rule would apply as well to coal.

As before pointed out, the instrument expressly "granted and leased" the "privilege" to mine all of the outcrop coal leased by Leckie, yet the majority holds

that "no right or estate" was granted. "A lease of land for the purpose of mining coal, or extracting oil or natural gas from the soil, or rock, is, in effect, a grant of a part of the *corpus* of the land." Part Point 1, syllabus, *Haskell* v. *Sutton,* 53 W. Va. 206, 44 S. E. 533. See *Preston* v. *White,* 57 W. Va. 278, 50 S. E. 236; *Williamson* v. *Jones,* 39 W. Va. 231, 19 S. E. 436, 25 L. R. A. 222. Even a grant of "royalties" is a grant of an interest in the land. *Paxton* v. *Benedum-Trees Oil Co.,* 80 W. Va. 187, 94 S. E. 472. "Instruments by which estates or interests in minerals are created are frequently and without distinction called 'mining leases'. In determining whether the agreement as to the minerals is a lease or constitutes some other relationship, the intention of the parties is controlling." 58 C. J. S., Mines and Minerals, Section 165. I can not believe that the parties intended that Shawvers "release the said Leckie Smokeless Coal Company, party of the second part, from the payment of any damage claims of any kind for damage to the surface, growing crops, buildings or damage claimed due to the loss of springs, wells, or any source of water supply or any other damage that might be claimed as caused by the mining operations" of Leckie, for a "bare license", not assignable, and revocable at any time at the pleasure of Leckie, plus the five hundred dollars paid by Leckie. The instrument in the instant case has all the necessary elements of a valid contract. "A bare license is not a contract. However, a license may become an agreement for a valuable consideration, as where the enjoyment of it must necessarily be preceded by the expenditure of money; and where a license constitutes, in effect, a contract, the rights and obligations of the parties under such license agreement depend on the provisions thereof." 53 C. J. S., Licenses, Section 84. A valuable consideration was paid by Leckie for the release from liability, the five hundred dollars cash and the right to mine all outcrop coal, and Leckie was to receive a royalty of ten cents per ton for the outcrop coal mined. Nothing further was required to constitute the instrument a valid mining lease.

Conceding, for argument, that no title to the coal in place vested in Shawvers, and that the instrument constituted only a license, it is my opinion that the same can be no less than a license coupled with an interest. There was "granted and leased" to Shawvers the "privilege" of mining the outcrop coal, which, I believe, clearly vested in Shawvers such a "right", as that word is used in the majority opinion, as would enable Shawvers to mine such coal. In *Lumber Co.* v. *Fuel Company*, 88 W. Va. 61, 69, 106 S. E. 41, the Court stated: "* * * It is quite true that a mere license ordinarily may be revoked, and the licensee deprived of any right to act thereunder, but this rule is not without its limitations. Where the license is coupled with an interest granted upon a valid consideration, such license may not be revoked, but will confer upon the licensee the power to exercise the rights conferred so long as the interest to which the license is incident continues. * * *." (Numerous authorities cited). See *Funk* v. *Haldeman*, 53 Pa. 229; *Holt* v. *City of Montgomery*, 212 Ala. 235, 102 So. 49; *Rentfro* v. *Dettwiler*, 95 Mont. 391, 26 P. 2d 992; *Durell* v. *Freese*, 151 Okla. 150, 3 P. 2d 175; *Gibbs* v. *Anderson*, 288 Ky. 488, 156 S. W. 2d 876.

Even if the contract is only a bare license, as held by the majority, a jury should be allowed to determine: (1) Whether Shawvers, or those claiming under them, have made expenditures in the exercise of such license; and (2) whether Leckie, subsequent to the making of the instrument, abandoned or completed its deep mining operations on any area of the Shawver tract, and pointed out such area to Shawvers as a location where Shawvers could mine the outcrop coal. In this connection, it should be borne in mind that Shawvers owned the surface of the 264 acre tract.

The general rule seems to be that where a licensee under a bare license to mine coal makes expenditures in connection therewith, and in reliance thereon, the licensor will not be permitted to revoke the license. In some jurisdictions the rule is applied even where there

is no written agreement. "The rule that a parol license is revocable has some exceptions. If the enjoyment of it must be preceded necessarily by the expenditure of money, and the grantee has made improvements or invested capital in consequence of it, it becomes an agreement for a valuable consideration, and he is a purchaser for value. In such cases, equity holds that, for remedial purposes, the license shall be deemed an executed contract. And if revocation would work a fraud upon the licensee, equity will restrain such revocation, although its continuation results in an easement upon the lands of the licensor in favor of the lands of the licensee." 12 M. J., License to Real Property, Section 6. See *Pifer* v. *Brown,* 43 W. Va. 412, 27 S. E. 399, 49 L. R. A. 497; *Tufts* v. *Copen,* 37 W. Va. 623, 16 S. E. 793; *Coal Co.* v. *Kennedy Coal Corporation,* 134 Va. 1, 114 S. E. 233; *Kennedy* v. *Combined Metals Reduction Co.,* 87 Utah 532, 51 P. 2d 1064; *Durell* v. *Freese,* 151 Okla. 150, 3 P. 2d 175.

As I understand, the majority concedes that if Leckie abandoned any area of the Shawver tract after having completed its deep mining operations under such area, and pointed out the same to Shawvers as a location from which Shawvers could operate pursuant to the contract, Leckie could not thereafter reclaim the outcrop coal within that area, or deny Shawvers the right to mine the same. The following statement from the majority opinion would, I believe, settle that question: "We think that if Leckie had abandoned the coal at any time after its contract with Shawver such action would have been sufficient to satisfy the terms of the contract in that particular." Evidence relating to these propositions was submitted to the jury, and the jury returned a verdict in favor of plaintiffs. In my opinion the evidence fully justified the verdict.

W. L. Kelly testified to the effect that, as early as 1943, he and his brother, G. R. Kelly, were, together with Jennings Shawver, son of the lessees, mining outcrop coal under the Shawver lease, at locations pointed out or agreed to by Leckie, and that they paid, and Leckie re-

ceived, ten cents per ton for the coal so mined; that Kellys obtained an assignment of Shawvers' interest in the lease in 1944, and soon thereafter requested Coleman, chief engineer of Leckie, to make an additional location for Kellys; that Coleman took a map from the wall in his office and "marked off where I could mine and he gave me this map"; that Coleman indicated on the map with "a red pencil. This drain way—he gave me rights, he told me to mine around there. He had pulled out. There are dates on the pillars to show what year they pulled out"; that "They (meaning Leckie) done pulled out of this whole region"; and that the Kellys claimed only the right to mine the area pointed out to them by Coleman. This witness was asked the following question, and made the following answer: "Q. Did you make any openings on that land? A. Back over in there I opened here on this reserved acre of the Shawvers and Leckie drove in here. I mined here. They drove on the reserved acre according to the map which they had and I drove through this reserved acre. On this Leckie coal here I paid ten cents on the ton. Mr. Coleman came and checked me here so I would be sure to pay ten cents a ton when I hit on him here. And I showed him and paid ten cents a ton and he said that was just as good as a survey." He also testified that Gentry, president of defendant, Rainelle Coal Company, claiming under Leckie, offered Kellys $3,000.00 for their rights in the coal within the area claimed by Kellys and that the Rainelle Coal Company strip mined that area. G. R. Kelly testified that Dollinger, superintendent of Leckie, stated: " 'Kelly, you open anywhere on the Shawver tract. We are out of there.' He said he would like for myself and Jennings Shawver to get together and strip it. He said Leckie would realize more royalty that way"; that Coleman, Leckie's chief engineer, came to the Kelly operations on the Shawver tract "to see whether we was due to pay them royalties or not"; that the Kellys opened a mine "in a wooded area" on the Shawver tract, and that Gentry, president of defendant Rainelle Coal Company, offered Kellys

$3,000.00 for their interest in the Shawver lease. A survey of the premises under which the Kellys claimed the right to mine the outcrop coal was made by Patterson about September, 1948, who stated that there were no indications that Leckie was operating on the Shawver tract at that time.

W. W. Coleman, chief engineer of Leckie, recognized the map referred to by W. L. Kelly as a Leckie map, and stated that the map was probably made under his direction and supervision, and that the shaded areas on the map indicated that the coal had been removed from such areas. This witness was asked the following question, and answered as follows: "Q. You know where the Kellys operated? A. I understood the Kellys operated within the one acre reserve here. Mr. Shawver, himself, had a mine some seven or eight hundred feet south of the one acre reserve." With reference to the area where Kellys operated, he was asked the following question, to which he answered: "Q. Have all these pillars been pulled out in that section.? A. Yes, sir." This witness said that "I certainly don't remember giving them (Kellys) permission to work"; but when asked: "You don't remember refusing them a place?", answered: "No, I don't." John Marble, mine foreman for Leckie, testified as to the area of outcrop coal involved as follows: "Q. When was that area of the mine abandoned? The witness: In here? Mr. Haynes (examining counsel): Yes. A. Totally abandoned back to here"; and referring to when the pillars were pulled in the area, the witness testified: "Q. The last you recall in here was in 1941? A. That's correct." T. F. Dollinger, mine superintendent of Leckie, admitted that "practically all" of the pillars in the section of the Shawver tract claimed by Kellys had been pulled.

Thus we see that every witness who testified as to the controlling facts corroborated the witnesses of Kellys to some extent. There is no question, in my opinion, that Leckie had completed its deep mining operations as to

the area involved and had abandoned the same; that the Kellys and Jennings Shawver, acting under the Shawver lease, had mined outcrop coal for several years at locations agreed upon, recognized and approved by Leckie; that Kellys had paid, and Leckie received, ten cents per ton for the outcrop coal so mined; and that Shawver and Kellys had made expenditures in the opening and operation of their mines. Gentry admits the offer of $3,000.00 to Kellys for their interest, and does not deny the statement made by him, as testified to by W. L. Kelly, that "he would strip if it cost him $25,000.00." It may be significant to note that Leckie would have received ten cents per ton royalty for coal mined by Shawvers, but received thirty cents per ton for coal mined by the defendant Rainelle Coal Company.

This evidence, in my view, establishes abandonment by Leckie of the area of outcrop coal claimed by Shawvers, as well as the practical construction placed upon the Shawver-Leckie agreement by the parties, and the actions of the parties pursuant to that construction. It also demonstrates the inequitable results reached by the majority in construing the instrument as a bare license. Leckie appears to have been released from all liability as to any damage to the surface of the 264 acre tract, but Shawvers, and Kellys claiming under them, have lost all mining rights created by the instrument.

Being of the opinion that the Court, in an unwarranted exercise of its power, has destroyed rights created by the instrument under consideration, and has invaded the province of the jury, I respectfully dissent.