# CHARLESTON.

EDWIN MARMET *et als.* v. B. F. WATSON *et als.*

(No. 6301)

Submitted November 21, 1928. Decided November 27, 1928.

430

*Davis, Painter & Silverstein,* for appellants.
*Brown, Jackson & Knight* and *Lon H. Kelly,* for appellees.

LIVELY, PRESIDENT:

Defendants below, appellants here, served notice on plaintiffs below declaring forfeiture of a coal mining lease on 225 acres near Cedar Grove in Kanawha county held by plaintiffs and advised them and their tenants that possession of the property would be taken by them, claiming non-performance of covenants in the lease as ground of forfeiture. Thereupon this suit was instituted to inhibit defendants from interfering with plaintiffs' possession. Defendant answered, a temporary injunction was awarded, the parties went to proof, and at the final hearing the injunction was perpetuated upon findings of fact, from which defendants prosecutes this appeal. The parties will hereinafter be designated as lessors and lessee, for brevity and clarity.

The 225 acres leased, prior to 1901, had been mined by various persons, and much of the coal which could be mined practically having been taken out. In May, 1901, John Norvell, who was trustee for some of the owners in fee, organized with other incorporators the Mile Branch Coal Company, a West Virginia corporation, and took from the owners, the lessors, the coal mining lease here involved on the 225 acre tract for a term of ten years, at a fixed royalty per ton, and to pay a fixed minimum royalty of $1000.00 per year, payable quarterly, with right to the lessee, its successors and assigns to renew the lease at its expiration for such further period of years as it then might desire. Mile Branch Coal Company at the same time acquired a coal mining lease on an adjacent large tract of land, lying behind the 225 acres, known as the Bowers land, containing a large area of coal. In the lease here involved, right was given to the lessee to transport coal from adjacent lands over and under the leased tract. The

purpose of the Mile Branch Company seems to have been to operate the Bowers lease, and the merchantable coal in the 225 acres, and to put its miners' houses on the level land on the 225 acre tract, there being no level land on the Bowers lease which was hill land entirely. The Mile Branch Company began development with Norvell as its manager, producing very little coal from the 225 acres, its main development being on the Bowers land. On May 14, 1903, the Mile Branch Company sold and assigned all its property to the Marmet Company, and John Norvell continued as superintendent for the Marmet Company, and erected for that company about fifty miners' houses on the level land on the 225 acre tract. From the year 1904 until January, 1911, a period of seven years the coal mined on the 225 acres was 7,223 long tons, the royalty on which could not have exceeded five or six hundred dollars. During that period the minimum royalty of $1000.00 per year was paid lessors, amounting to $7000.00. According to the evidence of several of the miners who worked for the Marmet Company in 1904 and later there was very little coal on the 225 acre tract bordering on the Bowers land which could be mined, that in mining on the Bowers land they frequently broke through on the 225 acre tract into the old workings on that tract and found that the coal had been taken out. The last coal mined on the 225 acres was in the first part of January, 1911. On July 1, 1911, the lessors renewed the lease to Marmet Company for a period of 20 years under the same terms, stipulation and conditions contained in the original lease. Since that time until the beginning of this suit no coal has been mined, although the minimum royalty of $1,000.00 per year has been paid, amounting to 16 or 17 thousand dollars. Two or three years after this renewal of 1911 was made the Marmet Company went into the hands of a receiver who operated its properties until a judicial sale was made and confirmed in 1919 to Western Bank & Trust Company, which purchaser deeded the entire property including the lease here involved to plaintiff, Edwin Marmet, in June, 1920, who has since kept paid up the minimum royalty.

The pertinent part of the lease contract on which lessors

base their right to declare and enforce the forfeiture is found in clause 10, which reads as follows: "It is further agreed that if the lessee, its successors or assigns, fail on its part to pay the rent and royalties aforesaid in the manner and at the times hereinafter provided, and such failure shall continue for the space for more than twenty days; and further, if the lessee shall cease to work and mine said coal for a period of six consecutive months, (excepting on account of strikes or unavoidable causes) then in either case such failure (at the election of the lessors, their heirs or assigns, after 30 days' notice) shall work forfeiture of this lease, and said lessors, their heirs or assigns, shall thereupon be entitled to re-enter upon and take possession of the demised premises and any and all pertinent improvements thereon, and to enter and remove said lessee and all persons claiming under it or its agents." The rents and royalties bargained for in the lease were not in arrear at the time the lessors declared forfeiture and served notices of such upon the lessee and its tenants. In the answer the lessors set up that the houses upon the leased premises have been permitted to become decayed and are out of repair; that they are in much worse condition than when the Marmet company took the lease way back in 1903; and that the rents, issues and profits of these buildings if turned into the hands of the lessors would more than equal the minimum royalty which has been regularly paid. Such a situation may be a cause of complaint, but it is no cause of forfeiture, and we can see little bearing which it has in this case.

Other portions of the lease which indicate the intention of the parties, and which bear upon the right of forfeiture are found in other sections. Section, or clause, 1 provides that the lessee shall proceed to work to take the coal from the lease in an effectual, workmanlike and proper manner, and that during the continuance of the lease all mines shall be so worked as to permit the getting out of all the merchantable coal practicable in each and every seam worked on said leased premises, where the same can be worked at a profit to the lessee. And in section or clause 3 we find, "it is further understood that said lessee shall not be required to mine coal

from any of said seams where the thickness of the same is less than 36 inches, at the above mentioned royalties; but if the lessee elects to mine any such seams of a less thickness, the royalties to be paid upon same are in such cases to be hereafter agreed upon in writing.'' Clause or section 7, in substance, says that if at the termination of the lease the lessee has not mined all of the coal and does not elect to renew, it must leave the mines and permanent improvements in good order and repair so the mining of coal may be continued by the lessors or a new lessee; but that this requirement is not to prevent the lessee from drawing pillars from such portions of the mines as may be so far mined as to make further mining through such parts unprofitable; and that all permanent structures remaining on the property at the expiration of the lease become property of the lessor. Clause ten also provided, in substance, that if by reason of faults, or other cause the coal becomes too thin or impure to be mined at a profit to the lessee, then he could, after notice, surrender the lease. This covenant was for the lessees' benefit and was optional with him. He chose to continue the lease by paying the minimum royalty, and because he did so, was not an admission that the coal remaining was such that it could be mined at a profit. That covenant but accentuates the fact that the parties knew that the coal remaining, or at least a part of it, might not be of sufficient thickness of seam, or quality, to warrant its removal at a profit.

These provisions of the lease contract impel the conclusion that the parties did not intend that the lessee should take out of that land every ton of coal found therein. That would be a grievous and unreasonable burden upon any lessee. The intention was that the lessee should get out all the merchantable coal practicable, where the seam could be worked at a profit to the lessee; and he was not required to mine coal from any of the seams where the thickness of the same was less than 36 inches unless he elected to do so, and in that case the royalties would be then agreed upon. Much of the evidence relates to the condition of the miners' houses on the lease; lessors contending that they have been allowed to become dilapidated and out of repair; while on the other hand

the lessee contends that they are in reasonable repair for the purposes for which they are used, taking into consideration the long number of years in which they have been built. We do not think this controversy is material to the issues here involved, namely, the right of the lessor to forfeit the lease, because the upkeep and condition of the miners' houses are not cause for forfeiture. Forfeitures are not favored by the courts, and when there are provisions for forfeitures in contracts, they are strictly construed against the person for whose benefit they are inserted. *Carbon Black Co.* v. *Gillispie,* 87 W. Va. 441.

The other fact at issue about which the remaining evidence is taken is concerning the coal which remains under the land, the practicability of mining it at a profit by practical methods of mining; and the width of the seams of coal. The lessors assert, and there is evidence to sustain that assertion, that there is from one-half to two-thirds of the coal remaining in the land; while the lessee contends, and there is much evidence to sustain his contention, that all of the coal practicable to be mined has been already taken from the land, and that no seam remains therein which has a thickness of more than 36 inches. From this evidence the chancellor made the finding of fact which he incorporated in the decree and which finding is that no seam of coal of 36 inches in thickness remains under this land; and that there is no seam of coal under the land which can be mined at a profit to the lessee or which is workable coal within fair intent and meaning of the lease and agreement between the parties. The lessors say that this finding of fact under the evidence is absurd, and we are asked to correct that finding on this appeal; and they further contend that the condition for forfeiture, above quoted, has been clearly violated, working a forfeiture. On the other hand, the lessee says the finding of fact is right and proper under the evidence; and that under all of the facts and circumstances the lessors have waived forfeiture, or are now estopped from attempting to assert it. It is pointed out by the lessee that when this lease was taken from the Marmet Company back in 1903 it was considered valuable only as appurtenant to development of the Bowers lease which at that

time was the main operation and object of the Mile Branch Company, which was begun and managed by Norvell, trustee, for some of these owners, and who is one of the defendants in this suit. Marmet says that he had such conversation and understanding with Norvell at that time; and that the chief value of the 225 acre lease was because of its level land on which to build the miners' houses; and also as a means by which the coal lying beyond could be transported over or under this land which lay between the Bowers lease and transportation. They also contend that no coal having been mined since the first part of January, 1911, a fact well known to the lessors, they never attempted to assert a forfeiture for that reason, but renewed the lease for 20 years at a time when cause of forfeiture had occurred, and thereafter continued to accept the minimum royalty; and stood by and allowed Marmet to purchase this property in the year 1920 only valuable to him for purposes above set out, and in that way lead him to believe that they had abandoned any claim of forfeiture for failure to mine coal for six months. A very significant fact which buttresses this contention is that in January, 1911, the first part of that month, coal ceased to be mined on the land and has never since been mined. After the right of forfeiture had accrued, the six months period had passed, namely, on the first of July, 1911, and the lessors knowing that condition, extended the lease for a period of 20 years. It is true that this extension was on the same terms and conditions of the original lease, but can we say that this renewal of the lease for 20 years was simply a condonation of causes of forfeiture which then existed? May not the present lessee have relied upon that waiver, and concluded that no forfeiture would be declared or insisted upon for that reason in the future? But under the view we take, it is not necessary to consider waiver. We think the lessors are right in their contention that the acceptance of minimum royalty only condoned the cause of forfeiture existing when the money was accepted. It did not waive the right to declare a subsequent forfeiture for this continuing cause. The payment of minimum royalty, *ipso facto,* would not prevent forfeiture for a subsequent non-payment. *Bluestone Coal Co.*

v. *Bell,* 38 W. Va. 297; *McKildoe's Ex'or.* v. *Darracott,* 13 Grat. 278; 16 R. C. L., p. 1136, sec. 657.

Taking the lease ''by its four corners'' and construing it with the purpose of finding the intent, supplemented by the situation of the parties, the condition of the property, its former workings (which can always be shown, that is, the circumstances surrounding the parties, *Watson* v. *Buckhannon River Coal Co.,* 95 W. Va. 164) and what was done under it by the parties, thereby giving it a practical construction, we find it reasonably clear that the parties intended that only such coal should be mined from seams of 36 inches or more in thickness, or if the lessee so chose from seams of lesser thickness; and such coal, which from its thickness or quality, could be mined by approved modern economical methods at a profit to the lessee. And further, that forfeiture would apply upon failure of the lessee to mine *such* coal for a period of six consecutive months, and also from failure to promptly pay rents and royalties. The trial court so construed the lease, and we approve that construction. It follows that if the evidence shows no seam of 36 inches or over, and none profitable to work, there can be no forfeiture under the clause of forfeiture. The evidence is in irreconcilable conflict as to the thickness of the seams and the tonnage of coal remaining. The evidence rather preponderates that none of the coal can be mined at a fair profit under the conditions of the coal industry in late years. Wm. Marmet says the coal had practicably been mined out at the time the lease was acquired by Marmet Company, and that Norvell told him that the main object of the Mile Branch Coal Company in acquiring the lease was for sites for the miners' houses. Norvell does not deny. Krebs states that there remains on the property 315,000 tons of recoverable coal in 90 acres of the tract which has not been worked; that the average thickness of the Cedar Grove seam is 35 inches; and another seam, locally known as the Tunnel seam (reached by shaft), underlying the tract is a little over four feet with some impurities. Perhaps three of the miners testify that they measured this seam at the bottom of a shaft on the lease and found it to be about two and one-half feet in thickness. We cannot say that the evi-

dence for the lessors on these questions of fact so preponderates that the trial chancellor's finding of fact should be reversed. A decree of a lower court comes to the appellate with a presumption of correctness; and when the evidence on which a finding of fact is based, is thoroughly examined by the appellate court, and it cannot say therefrom that the lower court was clearly wrong, the decree will not be disturbed. *Ruckman* v. *Cox*, 63 W. Va. 74; *Cyphers* v. *Dingus*, 130 Va. 721. This principle is so well established that citation of authority would be superfluous. The point was raised and ably argued by counsel for lessors, that the court by perpetuating the injunction, has tied up the property of lessors indefinitely, inasmuch as the renewal lease contains another option to lessee to renew at its expiration in 1931, and has made a new contract for them. We do not think that necessarily follows, for the lease is predicated on the removal of coal of 36 inches or over, and such as can be mined at reasonable profit. Lessee says that no coal of that character exists. Wherefore then, should the option to renew be granted?

We affirm the decree.

*Affirmed.*