IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 17-0847

_____

FILED

**March 20, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

THE BRUCE MCDONALD HOLDING COMPANY, DAVID B. MCDONALD
LAND COMPANY, OAKLEY, LLC, S.E. MCDONALD, LLC, CB MORRIS, LLC,
L.O.U., LLC, GLENN T. YOST, AS ATTORNEY-IN-FACT FOR ERNEST
PHIPPS CREDIT SHELTER TRUST, AND CDC REAL ESTATE, LLC,
Petitioners

V.

ADDINGTON, INC., THE BRINK'S COMPANY
AND PITTSTON COAL COMPANY,
Respondents

_____

Appeal from the Circuit Court of Logan County
Honorable James H. Young, Jr., Judge
Civil Action No. 16-C-70

AFFIRMED

_____

Submitted:  February 12, 2019
Filed:  March 20, 2019

Brian A. Glasser, Esq.                    W. Henry Jernigan, Jr., Esq.
Sharon F. Iskra, Esq.                     Alexander C. Ward, Esq.
Bailey & Glasser LLP                      Dinsmore & Shol
Charleston, West Virginia                 Charleston, West Virginia
Nicholas S. Johnson, Esq.

Bailey & Glasser LLP
Washington, DC
Attorneys for Petitioners

Shawn P. George, Esq.
Jennie O. Ferretti, Esq.
George & Lorensen
Charleston, West Virginia
Attorneys for Respondent
Pittston Coal Company

Howard M. Persinger, III, Esq.
Persinger & Persinger, LLC
Charleston, West Virginia
Counsel for *Amicus Curiae*
WV Land & Mineral Owners Association

Wade W. Massie, Esq.
Penn, Stuart & Eskridge
Abingdon, Virginia
Attorneys for Respondents
Addington, Inc. and The Brink's
Company

JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE JENKINS dissents and reserves the right to file a dissenting opinion.

JUSTICE WORKMAN, deeming herself disqualified, did not participate in the decision of this opinion.

JUDGE BLAKE, sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1. "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syllabus point 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

2. "As with other contracts, the language of a lease agreement must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument. Accordingly, specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." Syllabus point 3, *Moore v. Johnson Serv. Co.*, 158 W. Va. 808, 219 S.E.2d 315 (1975).

3. "The common-law doctrine of waiver focuses on the conduct of the party against whom waiver is sought, and requires that party to have intentionally relinquished a known right. A waiver may be express or may be inferred from actions or conduct, but all of the attendant facts, taken together, must amount to an intentional relinquishment of a known right. There is no requirement of prejudice or detrimental

reliance by the party asserting waiver." Syllabus point 2, *Parsons v. Halliburton Energy Servs., Inc.*, 237 W. Va. 138, 785 S.E.2d 844 (2016).

4.      The essential elements of the doctrine of waiver are: (1) the existence of a right, advantage, or benefit at the time of the waiver; (2) actual or constructive knowledge of the existence of the right, advantage, or benefit; and (3) intentional relinquishment of such right, advantage, or benefit.

5.      "Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." Syllabus point 1, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

6.      "The laws which subsist at the time and place where a contract is made and to be performed enter into and become a part of it to the same extent and effect as if they were expressly incorporated in its terms." Syllabus point 1, *Franklin Sugar Ref. Co. v. Martin–Nelly Grocery Co.*, 94 W. Va. 504, 119 S.E. 473 (1923).

7. "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." Syllabus point 3, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

**Hutchison, Justice:**

The Petitioners brought this appeal from an August 25, 2017 summary judgment order of the Circuit Court of Logan County.[1] The Petitioners filed an action against the Respondents based upon a coal lease agreement between the parties.[2] The circuit court granted summary judgment against the Petitioners after concluding (1) the Respondents had no obligation to diligently mine coal; and (2) the Respondents did not have to make royalty payments based upon comparable sales by other mining companies. Additionally, the circuit court granted summary judgment against the Respondents' counterclaim. The counterclaim sought damages for Petitioners' refusal to consent to an assignment or sublease of the coal lease, and damages for alleged tortious interference with an asset agreement Respondents had with another company. In this appeal, both parties assign error to the dismissal of their respective claims. Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we affirm.[3]

---

[1]The Petitioners describe themselves as a group of family owned businesses and are named as follows: The Bruce McDonald Holding Company, David B. McDonald Land Company, Oakley, LLC, S.E. McDonald, LLC, CB Morris, LLC, L.O.U., LLC, Glenn T. Yost, attorney for Ernest Phipps Credit Shelter Trust, and CDC Real Estate, LLC.

[2]The Respondents are Addington, Inc., The Brink's Company and Pittston Coal Company. Pittston Coal is a subsidiary of Brink's and is the parent company of Addington.

[3]We wish to acknowledge the amicus curiae brief of West Virginia Land and Mineral Owner's Association, which was filed in support of the Petitioners.

1

# I.

## FACTUAL AND PROCEDURAL HISTORY

On June 19, 1978, the Petitioners executed a coal lease agreement with the Respondents.[4] The lease permitted the Respondents to mine coal on roughly 3,300 acres of coal lands owned by the Petitioners in the Huff Creek area of Logan County, West Virginia.[5] The lease required the Respondents to make royalty payments to the Petitioners.[6] Specifically, under the lease, royalty payments were set to commence in the fifth year of the lease, with a minimum royalty payment due each year of the lease, even if the Respondents did not mine coal. Pursuant to the lease, the minimum royalty payments increased the sixth, seventh, eighth, ninth and tenth years of the lease.[7] In the eleventh year

---

[4]The Petitioners actually entered the lease with Elkay Mining Company, which was a subsidiary of The Pittston Company. The Pittston Company executed a contract on June 22, 1978 as the guarantor for Elkay Mining. The Pittston Company is not the same as the Pittston Coal Company. The Pittston Company changed its name to Brink's Company in 2003. According to the Petitioners, the "Pittston Coal Company is not in the chain of lease or guaranty obligations and is a defendant on the tortious interference claim, only." In 1998, Elkay Mining assigned the lease to its sister company Addington. In an effort not to cause confusion, we will refer to the parent and subsidiary companies as the "Respondents" throughout the opinion.

[5]The maximum expiration term of the lease was not to extend beyond the year 2032.

[6]The Respondents were also obligated to pay the Petitioners' annual rent in the amount of $60,000.00.

[7]On January 8, 1982, the lease was modified so that the minimum royalty payments would not commence until the sixth year of the lease (June 19, 1983, through June 18, 1984).

2

of the lease and thereafter, the annual minimum royalty returned to the amount required under the fifth year of the lease.

In June of 1984, the Respondents gave notice to the Petitioners that they intended to terminate the lease and file an arbitration proceeding to determine whether the coal was merchantable and mineable.[8]  Subsequent to the notice of termination, the Petitioners filed three civil actions against the Respondents in circuit court.  The Petitioners sought to preclude arbitration and to recover unpaid rent and royalty payments.[9]  The three civil actions were consolidated in the Logan County circuit court.[10]  In an order entered on May 31, 1988, the circuit court found that the Respondents owed the Petitioners rent and royalty for the years 1984, 1985, 1986 and 1987.  The order indicated that a hearing would be held later to determine the amount of rent and royalty owed.

---

[8]The Respondents were ultimately enjoined by a circuit court from litigating in arbitration.

[9]At the time of the Petitioners' three civil actions, Respondents had not mined any coal under the lease.

[10]The Petitioners initially filed an action in Boone County on June 21, 1984, seeking to enjoin the Respondents from initiating arbitration.  While that action was pending the Petitioners filed a second action on March 6, 1986, in Logan County, in which they sought unpaid rent and minimum royalties for the year 1984.  Shortly after the second action was filed the Boone County action was transferred to, and consolidated with, the Logan County action.  On July 25, 1986, the Petitioners filed the third action in Logan County, in which they sought unpaid rent and minimum royalties for the year 1985.  All three actions were subsequently consolidated.

3

In a subsequent order dated November 1, 1988, the circuit court determined the amount of rent and royalty owed. The second order found that the Respondents owed annual rent of $60,000.00 for each of the years 1984, 1985, 1986 and 1987. The order further found that the determination of the minimum annual royalty payment under the lease was ambiguous because the Respondents did not mine and sell any coal under the lease. The order found that a strict application of the terms of the lease would result in the Respondents not having to pay any royalty to the Petitioners, because no coal was mined. The order addressed the dilemma and the solution as follows:

> Article XIII of the subject Lease provides that minimum annual tonnage royalties shall be paid, whether the coal is mined or not. It further provides that minimum royalties for unmined coal are to be based upon the actual sales prices of like quality coal sold "from the same preparation plant from which Lessors' said coal, hereby leased, was sold." Inasmuch as there was no "preparation plant from which Lessors' said coal, hereby leased, was sold" (there having been no production whatever of Lessors' coal by Lessee), a strict interpretation of the language of said Article XIII of the Lease, standing alone, would result in a finding for Defendants that no minimum tonnage royalty is payable. However, the purpose and intent of the language used, gathered from the subject Article and Lease as a whole, is to define damages and not eliminate damages, as urged by the Defendants. . . .
>
> 1. Therefore, the Court finds that Defendants should not be relieved of the obligation to pay minimum annual tonnage royalty but that such royalty shall be fixed at the minimum amount provided by Article VIII of the Lease, which is Two Dollars ($2.00) per ton.
>
> 2. Defendants owe to Plaintiffs Two Dollars ($2.00) per ton of 2,000 pounds of coal for minimum royalties for the lease years ending, and payable on June 19th of 1984, 1985, 1986, and 1987, as follows:
>
> a. June 19, 1984, Five Hundred Thousand Dollars ($500,000.00);
>
> b. June 19, 1985, Six Hundred Thousand Dollars ($600,000.00);

4

c. June 19, 1986, Seven Hundred Thousand Dollars ($700,000.00);

d. June 19, 1987, Eight Hundred Thousand Dollars ($800,000.00).[11]

The Respondents appealed the circuit court's order, but this Court denied the petition for appeal. The Petitioners did not appeal.

After the circuit court's order of November 1, 1988, the Respondents continued to fail to mine any coal under the lease. Instead, the Respondents paid the annual minimum royalty of $500,000.00 to Petitioners. This amount was based upon the lease's annual minimum coal production of 250,000 tons,[12] multiplied by the $2.00 per ton requirement set by the circuit court for periods when there were no sales of comparable coal by the Respondents. The Petitioners accepted the minimum royalty payments made each year by the Respondents until 2016.[13]

The Petitioners rejected the Respondents' 2016, royalty payment and filed the instant action on March 21, 2016.[14] The Petitioners' complaint sought (1) a declaratory

---

[11]As previously noted, the minimum royalty increased each year for several years because of the formula used in the lease.

[12]This was the minimum tonnage required under the lease beginning in the eleventh year of the lease and thereafter.

[13]The royalty payments made by the Respondents to the Petitioners totaled almost $20,000,000.00 for unmined coal.

[14]After the case was filed, it was transferred to the Business Court Division pursuant to Rule 29 of the West Virginia Trial Court Rules.

judgment that the Respondents had a duty to diligently mine coal; (2) damages for breach of the duty to diligently mine coal; (3) declaratory judgment that Respondents had to pay annual minimum royalties based on comparable sales by other coal companies; and (4) damages for breach of the duty to pay royalty based on comparable sales. The Petitioners also filed an amended complaint in December of 2016, seeking damages for alleged tortious interference with the performance under the coal lease. The Respondents filed a counterclaim alleging the Petitioners wrongfully refused consent to an assignment of the coal lease, and tortuously interfered with an asset agreement they had with another company. After a period of discovery, the circuit court granted summary judgment against the Petitioners' claims and summary judgment against the Respondents' counterclaims. This appeal followed.[15]

## II.

## STANDARD OF REVIEW

In this proceeding, we are called upon to review a summary judgment order of the circuit court. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). We have long recognized that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not

---

[15]The circuit court's reasons for granting summary judgment are set out in the Discussion section of the opinion.

6

desirable to clarify the application of the law." Syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963).

Additionally, it is well recognized that "[t]he interpretation of [a] contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgment, shall be reviewed *de novo* on appeal." Syl. pt. 2, *Riffe v. Home Finders Assocs. Inc.*, 205 W. Va. 216, 517 S.E.2d 313 (1999). Mindful of the *de novo* standard governing our review, we proceed to consider the substantive issues raised.

## III.
## DISCUSSION

### A. *Duty to Diligently Mine Coal and Royalty Based on Comparable Sales*

The two dispositive issues presented by the Petitioners are their claims that under the lease the Respondents had a duty to diligently mine coal, and that royalty payments for failing to mine coal should be based on comparable sales of coal by other mining companies. The Respondents argue that the Petitioners' interpretation of the lease is not supported by the terms of the lease. The Respondents assert that under the Petitioners' interpretation of the lease they would be "obligated to mine 1,000,000 tons a year or more," when the lease sets minimum production at 250,000 tons a year. Further, the Respondents contend that there is no language in the lease that requires payment for

7

unmined coal be calculated based upon comparable sales of coal by other mining companies. The circuit court rejected the Petitioners' arguments for several reasons, including the language of the lease and the judgment from the prior litigation, practical construction of the lease by the parties, *res judicata*, collateral estoppel, payment, estoppel, accord and satisfaction, and waiver.

We begin by observing that "[t]he general state law rule for leases is the same as for contracts: terms of the lease are not to be construed in a vacuum, but are to be read in their context." *Chesapeake Appalachia, L.L.C. v. Hickman*, 236 W. Va. 421, 436, 781 S.E.2d 198, 213 (2015). We have held that "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962). This Court has previously held:

> As with other contracts, the language of a lease agreement must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument. Accordingly, specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract.

Syl. pt. 3, *Moore v. Johnson Serv. Co.*, 158 W. Va. 808, 219 S.E.2d 315 (1975). *See* Syl. pt. 2, in part, *Marmet v. Watson*, 106 W. Va. 429, 145 S.E. 744 (1928) ("In a coal-mining lease, all of its provisions must be considered in arriving at the intention of the parties as to what particular coal should, or should not, be mined, and the situation of the parties, the

8

surrounding circumstances, and what the parties have done under the contract may be also considered in determining the intention."). We have also recognized that "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous." Syl. pt. 1, in part, *Berkeley County Public Service District, etc. v. Vitro Corporation of America*, 152 W. Va. 252, 162 S.E.2d 189 (1968). "Contract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syl. pt. 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W.Va. 275, 569 S.E.2d 796 (2002).

The decision in *Moore*, *supra*, made clear that "[a]s with other contracts, the overriding endeavor in the judicial construction of a lease agreement is to ascertain and give effect to the mutual intent of the signatory parties." Syl. pt. 5, *Moore*. Further, "[a]mbiguous or doubtful provisions of a lease agreement should be construed most strongly against the party who prepared the instrument." Syl. pt. 6, *Moore*. This Court has also recognized that, in the context of an ambiguous contract, the conduct of parties may have a bearing on the meaning or intent of a contract. That is, "[t]he rule of practical construction by acts of the parties applies . . . where the contract on its face is ambiguous and uncertain[.]" Syl. pt. 2, in part, *Salisbury v. Brooks*, 81 W. Va. 233, 94 S.E. 117 (1917). In this regard, we have observed that "[i]n cases where the language used by the parties to an instrument is indefinite or ambiguous, and hence of doubtful construction, the practical

9

interpretation put upon it by the parties themselves, as shown by their acts and conduct, is entitled to great, if not controlling, weight." *Gibney v. Fitzsimmons*, 45 W. Va. 334, 32 S.E. 189, 192 (1898) (internal quotations and citation omitted). *See* Syl. pt. 3, in part, *Vintroux v. Chilton*, 84 W. Va. 604, 100 S.E. 496 (1919) (holding that when a contract "is ambiguous and indefinite, and, on the interpretation thereof, the acts and conduct of the parties in the application of its terms and carrying them into effect, amounting to contemporaneous or practical construction, are entitled to great weight."). Finally, we have expressly held that we "will adopt the construction which the parties to an ambiguous contract, by their conduct and express agreements during performance, have placed upon it." Syl. pt. 1, in part, *Summit Coal Co. v. Raleigh Smokeless Fuel Co.*, 99 W. Va. 11, 128 S.E. 298 (1925). *See* Syl. pt. 6, *Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W. Va. 310, 288 S.E.2d 139 (1982) ("A lessor's acquiescence in lessee's interpretation of a coal royalty provision for the term of their lease is persuasive that such interpretation was the parties' understanding of their agreement."); Syl. pt. 4, *Cotiga* ("The rule relating to practical construction of provisions of a written instrument by the conduct of the parties thereto, like other rules of construction, may be resorted to by a court only when the parties have failed to express their intent in clear and unambiguous language; and such rule of construction can never be used to change the legal effect of clear and unambiguous language."); Syl. pt. 4, *Holdred Collieries of W.Va. v. Boone Cty. Coal Corp.*, 97 W. Va. 109, 124 S.E. 493 (1924) ("Where the terms of a contract are of doubtful meaning, a practical construction placed thereon by the acts of the parties, if consistent with legal rules, is controlling."); Syl.

10

pt. 1, *Clark v. Lambert*, 55 W. Va. 512, 47 S.E. 312 (1904) ("Practical construction of contracts is that given to agreements by the parties themselves by acts subsequently done with reference to the contracts. To such exposition of contracts the courts pay high regard, and will effectuate it if they can do so consistently with the rules of law.").

In the instant proceeding, one of the Petitioners' liability contentions is that they are entitled to damages because the Respondents breached the lease agreement by failing to mine any coal. The Petitioners argue that Article X of the lease required the Respondents to "diligently" mine coal. The relevant language in Article X reads as follows:

> The operations of the Lessee hereunder (Elkay) shall be conducted in accordance with a sound mining plan designed systematically to produce and recover from the leased premises all the merchantable and mineable coal herein leased and Elkay will diligently prosecute its operations on the premises hereby leased so that all the merchantable and mineable coal provided to be mined shall be mined and royalties therefor paid to McDonalds.[16]

---

[16]In the "Factual Background" section of their brief, the Petitioners cite to partial sentences in other Articles that they argue show that the Respondents had a duty to diligently mine coal. They also cite to the following language in the preamble of the lease:

> [I]t is the mutual intent of all parties hereto that the Lessee shall properly prospect and engineer such property, and that the Lessee herein shall systematically mine such property by multi-level deep, strip and auger mining in such manner as to ensure that all the merchantable and mineable coal in all of the seams leased as provided in Article X of this Lease, is mined and that all such coal so mined will be prepared,

The Petitioners assert that Article X unambiguously requires the Respondents to diligently mine coal.[17] They also argue that decisions from this Court permit them to obtain damages for the Respondents' failure to diligently mine coal. The Petitioners rely primarily on the decision in *Hamrick v. Nutter*, 93 W. Va. 115, 116 S.E. 75 (1923) for this proposition. In *Hamrick,* the plaintiff entered into a coal mining lease with the defendant. Under the lease, the defendant was obligated to pay royalty to the plaintiff for coal mined, and to pay a minimum royalty even if the amount of coal mined did not produce that amount of royalty. The defendant failed to mine coal and failed to pay the minimum royalty. After the trial court denied the defendant's motion to dismiss the action, it submitted certified questions to this Court. We held in *Hamrick* that the plaintiff had a cause of action for breach of contract because "the defendant breached all of his covenants, and particularly breached his covenants to pay the royalties as they accrued, and properly and diligently to develop the seams of coal, or either of them, for coal mining purposes as required by the lease."

---

marketed, and sold by such means and methods as will ensure the highest available sales prices therefor.

[17]As an initial ruling, the circuit court rejected the Petitioners argument that Article X required the Respondents to mine coal. The circuit court found that Article XIII controlled what mining was required:

The Court finds that, by its plain terms, this is a mine-or-pay Lease. That is, the lessee is required to mine annually the tons stated in Article XIII or to pay the required annual minimum production royalties on the tons that remain unmined at the end of the lease year. By either mining or paying the amounts stated in Article XIII, the lessee satisfies its obligations under the Lease.

*Hamrick*, 93 W. Va. 115, 116 S.E. at 77. *See* Syl. pt. 7, *Cotiga*, in part ("Where an oil and gas lease contains an express covenant requiring the lessee 'to proceed with due diligence to develop the same, and market the production therefrom to the end that the Lessor and the Lessee may derive the speediest return practicable for the oil and gas recoverable thereunder, due consideration being always given to the condition of the industry as a whole', an action for damages may be maintained by the lessor against an assignee of the lease for a failure to market the production of gas from wells on the leased premises in conformity with the requirement of such covenant."); Syl. pt. 6, *Grass v. Big Creek Dev. Co.*, 75 W. Va. 719, 84 S.E. 750 (1915) ("The owner of a lease for the production of oil and gas, containing the usual terms and conditions, must, if either mineral is found in paying quantities on the lands, exercise due and reasonable diligence in prosecuting operations thereunder for the mutual benefit of himself and his lessor; and, if he unreasonably fails or refuses so to do, damages therefor are recoverable against him in an appropriate action at law."). In light of how we resolve the issues in this case, *Hamrick* and the other cases relied upon by the Petitioners are not controlling.

The Petitioners' second liability contention is that "the plain language of the Lease . . . requires the minimum payments be set at the average sales price of the same quality of coal. In this case, that number will be easy to determine as neighboring operators are currently mining the same exact coal seams in adjacent mines." In making this second argument, the Petitioners fail to cite to any specific provision in the lease that supports their

13

contention. However, Article XIII provides that royalty was to be based on the average price of coal sold by the Respondents, not other coal companies. Article XIII addresses the issue as follows:

> In the event that Lessee shall during any such lease year, fail to mine and pay royalties upon such minimum annual production, then Lessee agrees to pay to Lessors at the royalty rates herein provided, royalties upon the balance of such required annual production which Lessee failed to mine during such year, said royalties to be based on the average sales price at which the same quality of coal was sold by Lessee to consumers by arms length transactions from the same preparation plant from which Lessors' said coal, hereby leased, was sold, which average price shall be obtained by the use of the monthly sales average for such quality of coal sold from said preparation plant during the last three (3) months of the year in which the deficiency occurred.[18]

---

[18]As an initial ruling, the circuit court rejected the Petitioners' "comparable sales" argument on the grounds that Article XIII and the decision in the prior litigation controlled the issue. The circuit court's order stated the following:

> The other issue that the Court must answer involves the royalty rate to be applied to the tons required to be mined under Article XIII in order to calculate the annual minimum production royalties due. This issue was decided in the Prior Litigation. There, the Court found that, in the absence of sales of comparable coal by the lessee, the royalty rate to be applied was $2.00 per ton, which is the minimum royalty rate set forth in Article VIII. In this case, the McDonald Companies have no evidence of any sales by the lessee, and, therefore, the Court concludes that they have no claim to a royalty rate of more than $2.00 per ton.

14

As previously noted, the circuit court rejected Petitioners' claims that under the lease the Respondents had a duty to diligently mine coal, and that royalty payments for failing to mine coal should be based on comparable sales of coal by other mining companies. The circuit court initially ruled that based upon the unambiguous language of the lease and the judgment of the prior litigation, the Respondents did not have a duty to mine coal and that the royalty rate for failure to mine coal was $2.00 per ton. As an alternative disposition of the claims, the circuit court held that even if the lease was ambiguous, the Petitioners' claims should be dismissed because of the practical construction of the lease by the parties, and under the doctrines of res judicata, collateral estoppel, payment, estoppel, accord and satisfaction, and waiver.[19] We need not go through an exhaustive analysis of the grounds relied upon by the circuit court, because the Petitioners' claims can be readily disposed of under the doctrines of waiver and collateral estoppel.[20]

**1. Waiver**. The Petitioners seek a legal determination, in the form of a declaratory judgment, on the issue of whether the Respondents had a duty under the lease

---

[19]The circuit court also ruled that insofar as the lease was not breached, the Petitioners did not have a claim for alleged tortious interference with the performance under the lease.

[20]It should not be inferred that the other grounds relied upon by the circuit court had no merit. We believe that each of the grounds relied upon by the circuit court have merit, we simply choose to limit consideration to only two of those grounds for denying relief to the Petitioners.

15

to diligently mine coal. As we will show, the Petitioners' conduct waived their right to have a legal determination as to whether the lease imposed a duty on the Respondents to diligently mine coal.

The common law doctrine of waiver "has been defined as the voluntary, intentional relinquishment of a known right." *Hoffman v. Wheeling Sav. & Loan Ass'n*, 133 W. Va. 694, 712, 57 S.E.2d 725, 735 (1950).[21] "To effect a waiver, there must be evidence which demonstrates that a party has intentionally relinquished a known right." Syl. pt. 2, in part, *Ara v. Erie Ins. Co.*, 182 W. Va. 266, 387 S.E.2d 320 (1989). We have long recognized that,

> Waiver is where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterward.

*Beall v. Morgantown & Kingwood R. Co.*, 118 W. Va. 289, 190 S.E. 333, 336 (1937) (internal quotations and citation omitted). We have formulated general principles underlying the doctrine as follows:

> The common-law doctrine of waiver focuses on the conduct of the party against whom waiver is sought, and requires that party to have intentionally relinquished a known right. A

---

[21]"While waiver is ordinarily a question of fact, where only one reasonable inference can be drawn from the evidence, the existence of a waiver becomes a question of law." *Kossler v. Palm Springs Developments, Ltd.*, 101 Cal. App. 3d 88, 99, 161 Cal. Rptr. 423, 431 (1980).

waiver may be express or may be inferred from actions or conduct, but all of the attendant facts, taken together, must amount to an intentional relinquishment of a known right. There is no requirement of prejudice or detrimental reliance by the party asserting waiver.

Syl. pt. 2, *Parsons v. Halliburton Energy Servs., Inc.*, 237 W. Va. 138, 785 S.E.2d 844 (2016). For the purpose of legal analysis, the doctrine of waiver has been summarized succinctly as follows:

> The essential elements of a waiver have been stated as: (1) the existence, at the time of the alleged waiver, of a right, advantage, or benefit; (2) knowledge, actual or constructive, of the existence thereof; and (3) a voluntary intention to relinquish such right, advantage, or benefit.

Louis J. Palmer, Jr., et al., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 8(c), pg. 252 (5th Ed. 2017). In light of the foregoing, we now hold that the essential elements of the doctrine of waiver are: (1) the existence of a right, advantage, or benefit at the time of the waiver; (2) actual or constructive knowledge of the existence of the right, advantage, or benefit; and (3) intentional relinquishment of such right, advantage, or benefit.

Since the inception of the lease, Article X has contained the phrase "diligently prosecute." Thus, the existence of the Petitioners' right to have the Respondents "diligently mine" coal has always been part of the lease.[22] As previously noted in this

---

[22]We make no representations as to what "diligently mine" coal means in the context of the lease in this case.

17

opinion, on November 1, 1988, a circuit court judgment was entered that required the Respondents to pay royalties to the Petitioners for failing to mine coal during the period 1984-1987. From the date of that judgment order to the date this action was filed, March 21, 2016, the Respondents did not mine coal. However, during that 28-year period, the Respondents annually paid royalties to the Petitioners in the amount of $500,000.00. More importantly, during that 28-year period the Petitioners knew they had a right under the lease to have the Respondents diligently mine coal. The record in this case demonstrates that the failure of the Petitioners to file an action during that 28-year period, to enforce their right to have the Respondents diligently mine coal, was intentional. Rather than mount a legal challenge to the conduct of the Respondents in failing to diligently mine coal,[23] the Petitioners intentionally chose to receive $500,000.00 a year while their coal remained in the ground for 28 years.[24] "Our cases consistently have demonstrated that, in

---

[23]The fact that the right to file an action existed did not mean such an action had merit, or that the Petitioners would prevail.

[24]The circuit court determined that the lease was a mine-or-pay lease. This determination was made in part because of statements by two of Petitioners' officers, its Rule 30(b)(7) corporate deponent and a finding by the circuit court in the prior litigation. The record shows that David B. McDonald, Sr., one of the owners, previously made the following two statements:

> Pittston signed a contract that has an option on the minimum production clauses. They can either mine coal and pay a royalty or pay royalty and not mine the coal.

> [I]n this contract they have said they will produce X amount of tons every year.... Now, it also states in there, if you produce it you pay royalty, if you don't produce it you pay a royalty, and that satisfies our requirements.

18

general, the law ministers to the vigilant, not to those who sleep on their rights." *State v. Blickenstaff*, 239 W. Va. 627, 630, 804 S.E.2d 877, 880 (2017) (internal quotations and citation omitted). The Petitioners slept on their right to mount a legal challenge to the Respondents' conduct under the lease for 28 years. *See AGA Shareholders, LLC v. CSK Auto, Inc.*, 589 F. Supp. 2d 1175, 1184–85 (D. Ariz. 2008) ("Conduct inconsistent with demanding strict compliance with the contract [ ] results in a waiver of the . . . contract provisions.") (internal quotations and citation omitted). In doing so, Petitioners waived their right to contest the Respondents' failure to mine coal. Consequently, the circuit court

---

The record also discloses that another officer, Paul Winter, made the following statement:

> In the first place, we inserted a mine or pay section in the lease in order to get production started which would have worked if the coal business had stayed good.

The Petitioners' Rule 30(b)(7) deponent, who was David B. McDonald, Sr., made the following admissions during his June 13, 2017 deposition:

> Q. Okay. And isn't this a mine-or-pay contract?
>
> A. We believe it is, take-or-pay, mine-or-pay, yes.
>
> Q. Has it always been a mine-or-pay contract?
>
> A. Yes.
>
> Q. Has the company always believed it is a mine-or-pay contract?
>
> A. To the best of my knowledge, yes.

In addition to these statements, the May 31, 1988, prior judgment order made the following finding:

> The Court finds that the Defendants [Respondents] covenanted and warranted to pay minimum royalties whether or not the coal was actually mined.

19

did not err in granting summary judgment to the Respondents on the Petitioners' duty to diligently mine claim.

**2. Collateral estoppel**. The Petitioners also alleged in this action that, when coal was not mined, the Respondents were required to pay royalty based upon comparable sales by other coal companies. As we will demonstrate, the doctrine of collateral estoppel prevents the Petitioners from litigating this issue.

We have recognized that "[c]ollateral estoppel is designed to foreclose relitigation of issues in a second suit which have actually been litigated in the earlier suit even though there may be a difference in the cause of action between the parties of the first and second suit." *Conley v. Spillers*, 171 W. Va. 584, 588, 301 S.E.2d 216, 220 (1983). It has been said that "[t]he central inquiry on collateral estoppel is whether a given issue has been actually litigated by the parties in the earlier suit." *Mellon-Stuart Co. v. Hall*, 178 W. Va. 291, 299, 359 S.E.2d 124, 132 (1987). We have explained that "[w]hether those issues could have been litigated is not important; they actually must have been litigated." *Abadir v. Dellinger*, 227 W. Va. 388, 394, 709 S.E.2d 743, 749 (2011). The factors that must be considered in determining whether collateral estoppel applies are as follows:

> Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity

20

> with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Syl. pt. 1, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

The facts in the instant case clearly establish each of the *Miller* factors. First, in this case the Petitioners seek a determination as to how to calculate royalty when the Respondents fail to mine coal. The Petitioners contend that the Respondents are required to pay a royalty based upon comparable sales by other companies. This issue was resolved in the prior litigation. As mentioned previously in this opinion, the November 1, 1988, judgment order found that a literal interpretation of Article XIII of the lease would relieve Respondents of paying any royalty, if they failed to mine coal. The reason for this, as found in the prior judgment order, is that Article XIII "provides that minimum royalties for unmined coal are to be based upon the actual sales prices of like quality coal sold 'from the same preparation plant from which Lessors' said coal, hereby leased, was sold.'" Insofar as the Respondents had not mined any coal, the circuit court could not calculate royalty payments. In order to prevent an injustice to Petitioners from a literal application of Article XIII, the prior judgment order held that the Respondents "should not be relieved of the obligation to pay minimum annual tonnage royalty but that such royalty shall be fixed at the minimum amount provided by Article VIII of the Lease, which is Two Dollars ($2.00) per ton." This ruling was a determination of how to calculate royalty when the

Respondents failed to mine coal. This is the same issue the Petitioners now seek to litigate in this proceeding.[25]

The second factor under *Miller*, a final adjudication on the merits of the prior action, is satisfied. The circuit court in the prior action adjudicated the merits of the royalty issue, and entered a final judgment order disposing of the issue on November 1, 1988. The Petitioners did not appeal the prior judgment order establishing the manner in which royalty payments would be calculated when no mining occurred. The Respondents unsuccessfully attempted to appeal the ruling.[26] The 1988 judgment order is now final and has been so for over 28 years. The third *Miller* factor has been satisfied because the Petitioners were parties in the prior litigation. The last factor under *Miller*, a full and fair opportunity to litigate the issue, was satisfied. The prior judgment order states that a hearing was held to determine the method of calculating royalty when coal was not mined. The order also recites that oral argument was allowed, evidence was taken, and briefs by both parties were considered.[27]

---

[25]The Petitioners note that in the prior litigation they sought to have royalties based upon comparable sales of coal the Respondents sold under other leases. In this proceeding they are seeking to have royalty based upon coal sold by other coal mining companies. This is a distinction without a distinction.

[26]This Court denied the Respondents' petition for appeal on September 12, 1989.

[27]The Petitioners argue that "the Prior Litigation did not answer [the] question of what should the minimum royalty be for the years 2016, 2017, and on into the future,

In view of the foregoing analysis under *Miller*, we find the circuit court did not err in granting summary judgment to the Respondents on the Petitioners' claim that the Respondents were required to pay royalty based upon comparable sales by other coal companies.

### B. Refusal to Consent to an Assignment or Sublease of the Coal Lease

The Respondents filed a cross-assignment of error challenging the circuit court's dismissal of their counterclaim, which sought damages for Petitioners' alleged arbitrary and unreasonable refusal to consent to an assignment or sublease of the coal lease.[28] The circuit court ruled that the law at the time the lease was created "allowed a lessor to arbitrarily withhold consent to an assignment or sublease if the lease was 'silent' on the standard to be applied[.]" The Petitioners argue that at the time the lease was executed in 1978, if a lease required the consent of the lessor to an assignment or sublease, the lessor could withhold consent for any reason or no reason. The parties do not dispute that the lease requires the consent of Petitioners before the Respondents may assign or sublease the lease.

---

and thus, there is no bar to that issue through the doctrine of collateral estoppel." This argument has no merit. The prior judgment order put in place the method for calculating royalty, when coal was not mined, for the length of the lease, which is why that method was used for 28 years by Respondents.

[28]The Respondents did not raise, as a cross-assignment of error, the dismissal of their claim against the Petitioners for alleged tortious interference with an asset agreement Respondents had with another company.

23

We have recognized that "the law that is in effect at the time a contract is executed is the law that thereafter applies to and governs the parties' agreement." *Cabot Oil & Gas Corp. v. Huffman*, 227 W. Va. 109, 118, 705 S.E.2d 806, 815 (2010). That is, "[t]he laws which subsist at the time and place where a contract is made and to be performed enter into and become a part of it to the same extent and effect as if they were expressly incorporated in its terms." Syl. pt. 1, *Franklin Sugar Ref. Co. v. Martin–Nelly Grocery Co.*, 94 W. Va. 504, 119 S.E. 473 (1923). When the lease was executed in this case the common law rule, which was once the majority rule, was that "when a lease contains an approval clause, the landlord may arbitrarily and capriciously reject proposed subtenants." *Homa-Goff Interiors, Inc. v. Cowden*, 350 So.2d 1035, 1037 (Ala. 1977).[29] A commentator has summarized the common law rule on alienability of a leasehold as follows:

> Typically, courts have resolved disputes between lessors and lessees regarding the alienability of all or a portion of the leasehold by interpreting the provisions of the lease. If the lease contains no restriction on the alienability of the leasehold, the lessee may alienate his interest to any person or entity. If, however, the lessor's consent is required to approve an assignment, the lessee must obtain the lessor's consent prior to making a valid transfer. More importantly, courts traditionally have construed clauses that forbid the lessee from freely exercising his right to alienate as granting the lessor the

---

[29]It has been observed that a majority of courts that have addressed the issue have rejected the common law rule and impose "an implied duty of good faith and fair dealing in interpreting a silent consent clause." *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 666 (Tenn. 2013).

24

> absolute right to refuse consent to the alienation of the leasehold—even if the stated reason for refusal to consent is unreasonable, arbitrary, capricious, or made in bad faith.

Alex M. Johnson, Jr., *Correctly Interpreting Long-Term Leases Pursuant to Modern Contract Law: Toward A Theory of Relational Leases*, 74 Va. L. Rev. 751, 752 (1988). The common law rule was the law in this state in 1978, when the lease was executed. *See State ex rel. Van Nguyen v. Berger*, 199 W. Va. 71, 75, 483 S.E.2d 71, 75 (1996) ("[T]he common law, if not repugnant of the Constitution of this State, continues as the law of this State unless it is altered or changed by the Legislature.") (internal quotations and citation omitted); *Easley Coal Co. v. Brush Creek Coal Co*., 91 W. Va. 291, 112 S.E. 512, 517 (1922) ("Being a part of the common law, it is made effective here by the Constitution, and there being no repugnance between it and the constitutional provision, it must [c]ontinue the law of the State until altered or repealed by the Legislature.") (internal quotations and citation omitted").

The Respondents assert that they attempted to assign or sublease the lease to A.T. Massey Coal Company. However, the assignment or sublease did not occur because the Petitioners "arbitrarily and unreasonably refused to consent unless the lessee agreed to a five-fold increase in annual minimum production royalties--from $500,000 a year to $2,500,000 a year." The Respondents also assert that they attempted to sublease to Ramaco, LLC. However, the sublease did not occur because the Petitioners "demanded

25

that Article XIII of the Lease be amended to calculate payments on unmined coal based on comparable sales of other coal."

The lease in this case states in unambiguous terms that the Respondents "will not, without the prior written consent of McDonalds, either voluntarily or by operation of law, assign, transfer, sublet, or mortgage this lease, the leasehold estate hereby created or any part thereof." The Respondents have not pointed to any language in the lease that places restrictions on the Petitioners' right to withhold consent of an assignment or sublease. The Respondents, however, are asking this Court to insert a standard in the lease that prohibits the Petitioners from withholding their consent arbitrarily or unreasonably.[30] We have made clear that "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." Syl. pt. 3, *Cotiga*.

---

[30]The Respondents suggest that the standard should be a duty of good faith and fair dealing. However, we have recognized "[t]he implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those set out in the contract." *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 193 W.Va. 565, 572, 457 S.E.2d 502, 509 (1995) (internal quotations and citation omitted). *See Miller v. Massachusetts Mut. Life Ins. Co.*, 193 W. Va. 240, 244, 455 S.E.2d 799, 803 (1995) ("we do not recognize the implied covenant of good faith and fair dealing in the context of an at-will employment contract."); *Thompson Dev., Inc. v. Kroger Co.*, 186 W. Va. 482, 486, 413 S.E.2d 137, 141 (1991) ("If the lease was actively negotiated between the parties, then implying a covenant is disallowed since the parties were free to include whatever provisions they wished.").

26

In view of the law as it stood when the lease was executed, we find the circuit court did not err in granting summary judgment against the Respondents on their counterclaim.

## IV.

## CONCLUSION

In view of the foregoing, we affirm the circuit court's August 25, 2017 summary judgment order.

Affirmed.